**BOWNE OF NEW YORK CITY, INC., Plaintiff,**

v.

**AmBASE CORPORATION, Defendants, Counterclaim–Plaintiff,**

**Chemical Bank, Additional Defendant on Counterclaims.**

No. 92 Civ. 0053 (PNL).

United States District Court, S.D. New York.

June 3, 1993.

Anthony Princi, Leonard Cohen, Anderson, Kill, Olick & Oshinsky, New York City, for plaintiff.

Peter N. Wang, Robert A. Scher, Friedman, Wang & Bleiberg, New York City, for defendant AmBase Corp.

James L. Condren, Manuel W. Gottlieb, Chemical Bank, Legal Dept., Paul Doyle, Kelley, Drye & Warren, New York City, for defendant Chemical Bank.

## MEMORANDUM AND ORDER

DOLINGER, United States Magistrate Judge:

The parties to this hotly-contested lawsuit are currently seeking court resolution of a series of discovery disputes. Plaintiff Bowne of New York City Inc. and counterclaim defendant Chemical Bank are seeking to compel production of more than 1,500 documents withheld by defendant AmBase Corporation and its former counsel, Cravath Swaine & Moore, on claims of attorney-client privilege and work-product immunity.[1] They also seek answers to numerous questions posed at the depositions of various witnesses associated with AmBase; as to each, AmBase assertedly instructed the witness not to answer, almost invariably on the basis of a claim of privilege or work-product immunity. In its turn AmBase seeks to compel the production of a handful of documents that Bowne has withheld under the work-product rule.

For the reasons that follow, the motion of Bowne and Chemical is granted in part, albeit on certain conditions to be specified in this memorandum, and the motion of AmBase is denied.

## BACKGROUND

The nature of the parties' claims and defenses and the history of their dealings with each other bear heavily on the issues raised by the current motions. Accordingly, I briefly summarize the relevant background.

In September 1990 AmBase entered into a stock purchase agreement for the sale of one of its subsidiaries, the Home Insurance Company ("Home"), to an entity known as Home Holdings, Inc. The target date for the closing was to be no later than January 31, 1991, assertedly because a sale by that date would provide tax benefits to AmBase of at least $12 million.

In connection with the negotiation and implementation of this transaction, AmBase was represented by the law firm Cravath, Swaine & Moore. It also retained the services of a number of prominent financial consultants, including First Boston Company, Smith Barney and Prudential Bache. Based on consultations with its attorneys, AmBase determined to seek shareholder approval of the sale at a shareholder meeting to be scheduled for January 29, 1991, and accordingly it prepared a special proxy statement, which was printed by plaintiff Bowne and ultimately distributed under the auspices of Manufacturers Hanover Trust.

For reasons that are still the subject of dispute between the parties, the proxy statement was not mailed in time to conduct the closing prior to January 31, 1991. Whether for this or other reasons, the shareholder meeting and closing were held some time later, on February 12 and 13, 1991, respectively.

Subsequent to this transaction AmBase used Bowne to perform additional printing services for it in 1991, but failed to pay its bills to the printing firm for any of this work. (See Bowne v. AmBase, 1993 WL 126585, at *1 (S.D.N.Y.1993).) Ultimately Bowne filed suit against AmBase in January 1992, seeking approximately $1.6 million in unpaid fees. In its turn AmBase asserted three counterclaims against Bowne and Chemical Bank—the corporate successor to Manufacturers Hanover—and a fourth counterclaim solely against Bowne. The counterclaims all rest on the same premise—that Bowne and Manufacturers Hanover were responsible for ensuring that the special shareholder meeting documents were printed, processed and mailed by January 19, 1991, that they failed to carry out this task in a timely fashion, and that "[a]s a result, in whole or in part" of this failure (Answer and Counterclaims at ¶ 98), the meeting had to be postponed to February 12, 1991, and the closing could therefore not take place until February 13, 1991, thereby assertedly damaging AmBase in the amount of more than $23 million. (Id. at ¶ 99.) The first three counterclaims state claims for breach of contract, negligence, and fraudulent concealment; the fourth seeks a set-off against any award to Bowne on its claims.

---

1. The status of the Cravath documents is a bit obscure. At oral argument counsel stated that 912 documents were at issue (Tr. 19), an apparent reference to the AmBase documents listed in its privilege log. The motion papers, however, also include within their scope the 599 documents listed by Cravath in a separate privilege log.

Not surprisingly, the reasons for the so-called "missed mailing," and the question of whether it in fact caused the loss of tax benefits have constituted the central areas of pre-trial inquiry by Bowne and Chemical. The parties have sought and obtained quantities of documents, and have conducted numerous depositions to examine these matters. In the course of these inquiries, however, AmBase and its counsel invoked the attorney-client privilege and the work-product rule to block production of more than 1,500 documents and answers to more than 100 deposition questions. These privilege issues form the principal subject of the current motions, although AmBase also has objected to some deposition questions on other grounds.

## ANALYSIS

As noted, both sides seek relief under Rule 37(a). I address first the application of Bowne and Chemical.

### I. The Motions of Bowne and Chemical

#### A. General Standards

The general criteria for assessing the parties' respective claims of privilege and work-product immunity are well-known and need not be analyzed at length. Indeed, they have been reiterated to the parties both prior to and during the pendency of this motion.

■ As the Second Circuit has repeatedly noted, "'the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship.'" *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987) (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir.1984)). *Accord, e.g., United States v. Stern*, 511 F.2d 1364, 1367 (2d Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975); *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 523 (S.D.N.Y.1992). More broadly, the party seeking to invoke the privilege must establish all elements of the privilege. *See, e.g., In re Horowitz*, 482 F.2d 72, 82 (2d Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *United States v. Kovel*, 296 F.2d

918, 923 (2d Cir.1961); *In re Minebea Co.*, 143 F.R.D. 494, 503 (S.D.N.Y.1992); *Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 302 (S.D.N.Y.1991). *Accord, People v. Mitchell*, 58 N.Y.2d 368, 373, 461 N.Y.S.2d 267, 270, 448 N.E.2d 121, 123 (1983); *Priest v. Hennessy*, 51 N.Y.2d 62, 69, 431 N.Y.S.2d 511, 514, 409 N.E.2d 983, 985 (1980). This burden can be met only by an evidentiary showing based on competent evidence, *see, e.g., von Bulow v. von Bulow*, 811 F.2d at 144; *In re Minebea Co.*, 143 F.R.D. at 503; *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. at 523, and cannot be "discharged by mere conclusory or ipse dixit assertions." *von Bulow v. von Bulow*, 811 F.2d at 146 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)); *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d at 224–25.

■ As for the substance of what must be proven, we look to the elements of the privilege or immunity that is invoked. This action involves only state-law claims and defenses; accordingly under Fed.R.Evid. 501 it is state law that defines the elements of the attorney-client privilege. *See, e.g., Dixon v. 80 Pine Street Corp.*, 516 F.2d 1278, 1280 (2d Cir.1975); *Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 443 (S.D.N.Y.1990). Since the attorney-client relationship between AmBase and its counsel appears to have been based in New York, we look to the law of that state. *See, e.g., Application of Walsh*, 40 Misc.2d 413, 413–14, 243 N.Y.S.2d 325, 326 (Sup.Ct.1963). *See also Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. at 521 (citing cases).

■ New York law governing the attorney-client privilege is generally similar to accepted federal doctrine, albeit with certain variants to be noted. The privilege is defined by C.P.L.R. § 4503, which protects "confidential communications made between the attorney ... and the client in the course of professional employment...." To sustain a claim of privilege, the party invoking it must demonstrate that the information at issue was a communication between client and counsel or his employee, that it was intended to be and was in fact kept confidential, and that it was made in order to assist in obtaining or providing legal advice or servic-

es to the client. *See, e.g., People v. Mitchell,* 58 N.Y.2d at 373, 461 N.Y.S.2d at 269, 270, 448 N.E.2d at 122, 123. *Accord, e.g., People v. Osorio,* 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 614, 549 N.E.2d 1183, 1185 (1989); *Matter of Bekins Record Storage Co.,* 62 N.Y.2d 324, 329, 476 N.Y.S.2d 806, 809, 465 N.E.2d 345, 348 (1984). If the communication concerns business matters, the privilege does not apply. *See, e.g., Rossi v. Blue Cross & Blue Shield of Greater New York,* 73 N.Y.2d 588, 592–93, 542 N.Y.S.2d 508, 510, 540 N.E.2d 703, 705 (1989); *Matter of Bekins Record Storage Co.,* 62 N.Y.2d at 329, 476 N.Y.S.2d at 809, 465 N.E.2d at 348. Moreover, the privilege is vitiated if the contents of the communication are disclosed to others for reasons other than assistance of the attorney in the performance of legal services. *See, e.g., First Interstate Bank of Oregon, N.A. v. Nat'l Bank & Trust Co. of Norwich, N.A.,* 127 F.R.D. 186, 189 & n. 2 (D.Ore.1989) (applying New York law); *Matter of Estate of Baker,* 139 Misc.2d 573, 576, 528 N.Y.S.2d 470, 473 (Surr.Ct.1988); *People v. Fentress,* 103 Misc.2d 179, 193, 425 N.Y.S.2d 485, 494 (Sup.Ct.1980). *See also People v. Osorio,* 75 N.Y.2d at 84, 550 N.Y.S.2d at 614, 549 N.E.2d at 1185. In addition, the privilege is not absolute and thus may be set aside "where strong public policy requires disclosure." *Priest v. Hennessy,* 51 N.Y.2d at 69, 431 N.Y.S.2d at 514, 409 N.E.2d at 986 (citing *Matter of Jacqueline F,* 47 N.Y.2d 215, 220, 417 N.Y.S.2d 884, 888, 391 N.E.2d 967, 970 (1979)). *Cf. In re Bairnco Corporation Securities Litigation,* 148 F.R.D. 91, 96–98 (S.D.N.Y.1993).

▪ The invocation of the work-product rule is governed by federal law. *See, e.g., United Coal Companies v. Powell Constr. Co.,* 839 F.2d 958, 966 (3d Cir.1988); *Fine v. Facet Aerospace Products Co.,* 133 F.R.D. at 444–45. Accordingly, we look to Fed. R.Civ.P. 26(b)(3) for guidance. The rule defines a qualified immunity from discovery for documents "prepared in anticipation of litigation or for trial." This immunity applies as well to deposition testimony concerning the substance of such work-product. *See generally Gilhuly v. Johns–Manville Corp.,* 100 F.R.D. 752, 755 (D.Conn.1983); *Ford v. Philips Elect. Instruments Corp.,* 82 F.R.D. 359, 360 (E.D.Pa.1979). Nonetheless, the rule does not protect from disclosure the underlying facts known to the party or his counsel, even if acquired in anticipation of litigation. *See, e.g., Eoppolo v. National R.R. Passenger Corp.,* 108 F.R.D. 292, 294 (E.D.Pa.1985).

▪ In interpreting Rule 26(b)(3), the courts have generally held that it "applies only to documents prepared principally or exclusively to assist in anticipated or ongoing litigation." *Martin v. Valley Nat'l Bank,* 140 F.R.D. at 304. *See, e.g., Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 118–19 (7th Cir.1983); *In re Grand Jury Investigation,* 599 F.2d 1224, 1229 (3d Cir. 1979) (quoting 8 Charles A. Wright & Arthur Miller, *Federal Practice & Procedure: Civil* § 2024 at 198 (1970)); *Leonen v. Johns Manville,* 135 F.R.D. 94, 96–97 (D.N.J.1990); *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 644 (S.D.N.Y.1987); *Status Time Corp. v. Sharp Elec. Corp.,* 95 F.R.D. 27, 29 (S.D.N.Y.1982); *Janicker v. George Washington Univ.,* 94 F.R.D. 648, 650 (D.D.C. 1982); *Carver v. Allstate Ins. Co.,* 94 F.R.D. 131, 134 (S.D.Ga.1982). Thus, "if a party prepares a document in the ordinary course of business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation." *Martin v. Valley Nat'l Bank,* 140 F.R.D. at 304. *See, e.g., Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d at 1119; *Hardy v. New York News, Inc.,* 114 F.R.D. at 644; *Joyner v. Continental Ins. Cos.,* 101 F.R.D. 414, 415–16 (S.D.Ga.1983); *Janicker v. George Washington Univ.,* 94 F.R.D. at 650; *Atlanta Coca–Cola Bottling Co. v. Transamerica Ins. Co.,* 61 F.R.D. 115, 118 (N.D.Ga.1973).

▪ Even if the withheld information comes within the scope of the work-product rule, the immunity from discovery provided by the rule is conditional, that is, the protection may be set aside if the discovering party demonstrates a sufficiently pressing need for the data. *See, e.g., Golden Trade, S.r.L. v. Jordache,* 143 F.R.D. 508, 510 (S.D.N.Y. 1992). Such a showing requires proof that the inquiring party "has [a] substantial need of the materials in the preparation of [his]

case and that [he] is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R.Civ.P. 26(b)(3). *See, e.g., Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989).

## B. *Defendant's Failure of Proof*

■ Given these standards, we may readily conclude that AmBase has failed to carry its burden of proof on the current motions. Indeed, it has not even sought to do so.

In its motion papers AmBase offers no affidavits addressed to the underlying facts on which it purports to premise its claims of attorney-client privilege and work-product immunity. It also fails to cite any specific deposition testimony or other competent evidence on which it might rely in opposing the current motions.

Thus, although the deposition transcripts submitted establish that AmBase was represented by both in-house and outside counsel, and that the attorneys performed both legal services and some non-legal services, we have no concrete evidence on a host of key issues. These include whether any, some or all of the documents· at issue were communications for the purpose of facilitating the rendition of legal advice or other types of legal services by the attorney to the client; whether any, some or all were intended to be and were kept confidential; and whether, in the case of those documents either authored by, or addressed or later disclosed to, persons other than AmBase employees, the involvement of those other persons was to facilitate the rendering of legal services or for other purposes. The record reflects the same absence of information concerning those communications about which Bowne and Chemical unsuccessfully asked at depositions. Again, there is no affidavit evidence, and the witnesses at the depositions were instructed simply not to answer any questions pertaining to apparently numerous but unidentified communications that AmBase claims in conclusory fashion are privileged.

The record is equally silent with regard to the work-product immunity claimed by AmBase. We have no evidence as to which of the documents and oral communications that AmBase claims are covered by the work-product rule were in fact made principally in anticipation of litigation and which were made principally for other purposes. We also have no competent evidence with regard to the extent of confidentiality maintained by AmBase with respect to those materials.

The failure of AmBase in this respect cannot be attributed to ignorance. Apart from the presumed familiarity of its very competent counsel with the explicit requirements of Second Circuit holdings, AmBase's flawed approach comes in the face of repeated warnings as to the nature and extent of its obligations in asserting a privilege. The court notified the parties at the very first status conference in this case that, unlike other types of discovery disputes, privilege claims must be resolved on formal motions precisely because the party invoking the privilege bears the burden of proving the facts underlying any privilege claim by competent evidence, typically by affidavits. Moreover, at a conference held shortly before the filing of the current motions, the court reiterated this requirement. Furthermore, after AmBase filed its initial set of responding papers, which notably contained no evidentiary basis for its privilege claims, Bowne and Chemical heavily stressed this failing in their reply papers. At the request of AmBase, the court then conducted a telephone conference to entertain and ultimately grant a request by AmBase to file sur-reply papers. In doing so the court noted once again the requirement of an evidentiary submission and explicitly authorized AmBase to supplement its papers with affidavits if it wished to do so. Despite this invitation, AmBase chose to limit its sur-reply papers to legal arguments and counsel's conclusory assertions as to the facts.

In seeking to avoid the consequences of this failing, AmBase has advanced several alternative arguments. Its principal claim, articulated most explicitly at oral argument, is that in this case the discovering party bears the burden of making at least an initial showing that its adversary's privilege claims are not well taken, and that in any event the court may review the documents *in camera*

to determine whether its claims are well-founded. (Tr. 21–22.)

■■■■■■ This argument is not well-founded.[2] As noted, the decisions of the Second Circuit and of the New York Court of Appeals explicitly place upon the party invoking the privilege or work-product immunity the burden of proving the facts on which the claim is based. This burden allocation stems from several sources. First, enforcement of a claim of privilege acts in derogation of the overriding goals of liberal discovery and adjudication of cases on their merits. It is for this reason that privileges are disfavored and generally to be narrowly construed. *See, e.g., United States v. Goldberger & Dubin, P.C.,* 935 F.2d 501, 504 (2d Cir.1991); *In re Horowitz,* 482 F.2d at 81–82; *Priest v. Hennessy,* 51 N.Y.2d at 68, 431 N.Y.S.2d at 514, 409 N.E.2d at 985; *Matter of Jacqueline F,* .47 N.Y.2d at 219, 417 N.Y.S.2d at 887, 391 N.E.2d at 969. Second, the party invoking the privilege is typically in sole possession of the information that will determine the validity of the claim. Since the parties' relative access to relevant data is usually a significant factor in allocating burdens of proof, *see, e.g., Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 8 (2d Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990), it is appropriate to cast upon the party seeking privilege protection the burden of proving the relevant facts.

Although AmBase appears to suggest that such a requirement is unduly burdensome, especially in a large document case, it is in fact not at all unreasonable. If, as its counsel implied at oral argument, large numbers of the disputed documents came from the legal files of AmBase's corporate attorneys, it would seem to be a very manageable task for AmBase and its counsel to prepare affidavits by the appropriate attorneys setting forth the general nature of the documents that they have withheld, the provenance of those documents, and their confidential status, if such be the case. Indeed, Rule 46(e) of the Civil Rules of this Court requires that a party withholding documents on a claim of privilege compile much of this information and provide it in the form of a privilege log prior to the filing of any discovery motions, *see Chase Manhattan Bank, N.A. v. Turner & Newall, PLC,* 964 F.2d 159, 160–61, 165–66 (2d Cir.1992), and there is no reason why the affiants cannot make use of the data already compiled.[3]

In addition, to the extent that AmBase is claiming a privilege that encompasses not only communications between its officials and its attorneys, but also communications involving employees of AmBase subsidiaries or financial advisors to the company, it is incumbent upon defendant to establish whether these communications were in aid of the rendition of legal services. Again, this is not an insuperable or unreasonable burden to impose on the company.

Moreover, it bears noting that AmBase has chosen to invoke the privilege and work-product rule for a vast amount of material. If it could freely decline to offer a specific showing of factual support, this would simply place the burden on the court to sort through its documents and the numerous deposition transcripts to discover whether there is some evidence supportive of its claims. That result is plainly unacceptable.

AmBase argues alternatively that its preparation of a privilege list and its offer to the court to permit an *in camera* review of the documents suffices to meet its burden, at least with respect to the documents in dispute.[4] Again, defendant is mistaken.

In requiring a party to prove the factual basis for its claims of privilege, the courts generally look to a showing based on affidavits or equivalent statements that address each document at issue. *See, e.g., Willemijn*

---

**2.** At oral argument counsel for AmBase volunteered to provide the court with case law authority supporting his client's position. (Tr. 22–23.) None has been proffered that supports this claim.

**3.** Presumably someone with knowledge of the relevant facts conducted or supervised a document-by-document review to prepare the logs.

**4.** Obviously this proffer could not satisfy AmBase's burden with respect to the deposition questions.

*Houdstermaatschaapij B.V. v. Apollo Computer*, 707 F.Supp. 1429, 1443 (D.Del.1989); *King v. Conde*, 121 F.R.D. 180, 189–90 (E.D.N.Y.1988). "This approach need not invariably be taken, however, and particularly in cases involving large quantities of disputed documents, the court has broad discretion as to how to proceed." *Golden Trade S.r.L. v. Lee Apparel Co.*, 1992 WL 367070, at *5 (S.D.N.Y. Nov. 20, 1992). Among the possible alternatives available to the court is the utilization of an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps. *See, e.g., In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir.1992); *Golden Trade S.r.L. v. Lee Apparel Co.*, 1992 WL at *5. *See also Dole v. Milonas*, 889 F.2d 885, 890 (9th Cir.1989).

If the court chooses to rely on adequate privilege logs, typically the logs will identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between the individuals listed in the log and the litigating parties, the maintenance of confidentiality and the reasons for any disclosures of the document to individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony. *See, e.g., In re Grand Jury Investigation*, 974 F.2d at 1071; *Golden Trade, S.r.L. v. Lee Apparel Co.*, 1992 WL at *5. Even under this approach, however, if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected. *See, e.g., Golden Trade, S.r.L. v. Lee Apparel Co.*, 1992 WL at *6; *Martin v. Valley Nat'l Bank*, 140 F.R.D. at 305, 306–07; *Willemijn v. Houdstermaatschaapij B.V. v. Appollo Computer*, 707 F.Supp. at 1443. *See also In re Minebea Co.*, 143 F.R.D. at 503.

Judged by these criteria, AmBase cannot prevail. Putting to one side the court's re-

peated, explicit directions to the parties that they rely upon competent evidence, we must reject AmBase's argument because its privilege log, unsupported by any evidence, is inadequate to sustain its claims. As noted recently,

> [t]he standard for testing the adequacy of the privilege log is whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed. The focus is on the specific descriptive portion of the log, and not on the conclusory invocations of the privilege or work-product rule, since the burden of the party withholding documents cannot be "discharged by mere conclusory or ipse dixit assertions."

*Golden Trade S.r.L. v. Lee Apparel Co.*, 1992 WL at *5 (quoting, *inter alia, von Bulow v. von Bulow*, 811 F.2d at 146).

The privilege list of AmBase, even if we assume it *arguendo* to be adequate as a log under Civil Rule 46(e), cannot meet this standard for use on a discovery motion.[5] The log lists, for each document, the date, author, addressees, "other recipients," whether the document was a letter or memorandum or set of notes or other type of document, a very skeletal description of "subject" and an identification of the type of privilege claimed. Thus, for example, the first entry of the log lists a document dated November 8, 1990 and sent from "Bruce Bean" to "Bill Feil," with a copy to "Jack Plaxe." According to the log, this document was a "[h]andwritten memo with memo from Scott Freeman to Bruce Bean" and its subject was "Proxy Statement." We are also informed that AmBase claims that this document—whether simply the Bean memorandum or the Freeman memorandum as well, we are not informed—comes under the attorney-client privilege. Nothing on the log informs us whether the document contains legal advice or was prepared to elicit legal advice from others. We are also not informed whether the document

---

5. Civil Rule 46 addresses only the information required to be disclosed as part of the party's Rule 34 objections. It does not purport to speci-

fy the showing necessary in response to a motion to compel production under Fed.R.Civ.P. 37(a).

was intended to be kept confidential and whether it was in fact so held.[6]

Other entries on the first page of the log are even less informative. For example, the fourth listed document, dated January 22, 1991, is identified as "[h]andwritten [n]otes" by P.A.M. Shearer. The log does not list any addressee or other recipient and states only that the notes concerned "Pru–Bache." Although the work-product rule is invoked, we are not informed whether the notes were prepared in anticipation of litigation or for any other reason.[7] The same type of summary appears as the ninth entry on the page, but since these "[n]otes" by Ms. Shearer are described as "undated," we have virtually no clue as to the basis for the claim of work-product protection.

The balance of the log is much the same. There simply is not enough information supplied to support the privilege claims of AmBase with regard to its documents, particularly in the absence of any supporting evidence.[8] Moreover, neither the log nor any other submission by AmBase provides specific evidentiary support for the privilege claims of AmBase that were invoked in the course of depositions to block questioning about oral communications.

I note that AmBase insists in one of its submissions that its privilege claims, presumably for both documents and deposition testimony, are supported by evidence contained in the depositions. (*See* Feb. 23, 1993 letter brief at 1.) This suggestion is, at best, misleading. AmBase cites to no specific deposition testimony in support of any of its privilege claims. Moreover, the deposition transcripts supplied to the court reflect no testimony that supports its specific claims. Indeed, at the depositions AmBase generally, although not invariably, interposed broad-based objections that precluded witnesses from testifying in any respect to any commu-

nications that AmBase regarded as privileged. Thus it is plain that the detailed factual groundwork required for invocation of a privilege could not have been laid at those depositions.

Finally, I note AmBase's suggestion of *in camera* review in lieu of an evidentiary presentation is misplaced. Such review may be useful if there is a genuine dispute between the parties as to the accuracy of the withholding party's description of certain documents. *See, e.g., Golden Trade S.r.L. v. Lee Apparel Co.*, 1992 WL at *5. Such review is not, however, to be routinely undertaken, particularly in a case involving a substantial volume of documents, as a substitute for a party's submission of an adequate record in support of its privilege claims. *See, e.g., King v. Conde*, 121 F.R.D. at 190 (citing *Kerr v. United States District Court*, 426 U.S. 394, 405–06, 96 S.Ct. 2119, 2125–26, 48 L.Ed.2d 725 (1976) (*in camera* review available only after adequate "threshold showing" by party withholding documents)).

Given the inadequacy of the current record, we are faced with the question of whether and to what extent AmBase may be permitted still another opportunity to support its claims. In view of the clear notice to AmBase of the requirements imposed by the court in this regard and the multiple opportunities afforded to defendant to supply the necessary data, we might well conclude that affording still more opportunities to meet the applicable standards would not be justified. As one court noted in a somewhat less egregious situation: "Before compiling its withheld document list, plaintiff could easily have ascertained the standard of particularity expected by this Court and could have met that standard. Allowing it to do so now would encourage dilatory discovery practices." *Willemijn Houdstermaatschaapij B.V. v.*

---

6. Other than Mr. Bean, its former general counsel, AmBase does not identify the individuals, although it becomes readily apparent from a review of the deposition transcripts that Mr. Freeman is an attorney at the Cravath firm and that Messrs. Feil and Plaxe were senior officers of AmBase.

7. I note that AmBase appears to take the position that an attorney's notes to the file on legal mat-

ters are necessarily protected even if not in contemplation of litigation. This is not the law. *See, e.g., Golden Trade, S.r.L. v. Lee Apparel*, 1992 WL at *6 (citing *Natta v. Zletz*, 418 F.2d 633, 637 n. 3 (7th Cir.1969)).

8. The log supplied by Cravath for its documents is somewhat more detailed in its summary of subject matter.

*Apollo Computer,* 707 F.Supp. at 1443. In view of the amount of time and money already spent in pursuing this matter, as well as the established national policy of expediting the completion of pre-trial proceedings in civil cases (*see* Civil Justice Reform Act of 1990, 28 U.S.C. § 471 *et seq.*), further extending this matter could fairly be viewed as subverting the recognized interest in judicial economy and imposing unfair burdens on the other parties to this lawsuit.

■ Nonetheless, for several reasons the court will not, at this stage, simply reject *in toto* the claims of AmBase and its counsel. First, it appears from the privilege logs that many of the documents might well be protected attorney-client communications.[9] Second, the universe of disputed documents will be substantially narrowed by rulings made in the course of this memorandum, thus ensuring a more manageable set of issues, if any are left. Third, for reasons to be noted, the expenses incurred by Bowne and Chemical by virtue of the failings of AmBase's motion practice can and will be subject to reimbursement as the price for still further litigation on this matter.

In sum, I conclude that the showing of AmBase is plainly inadequate. It will be given one last opportunity to make a proper showing with respect to those documents that are not affected by the following rulings on the legal issues.[10]

### C. *Waiver By Prior Disclosure*

The nature and extent of AmBase's asserted waiver of the attorney-client privilege and work-product immunity require a brief summary of a related set of lawsuits. In early 1991, in the wake of the "missed mailing" and the delayed closing of the Home transaction, AmBase terminated Paul Robitaille, its Assistant Vice–President, Director–Investor Relations, and two other officers.[11] The three then filed suit in this court against AmBase in mid- and late 1991, claiming that AmBase had breached their respective severance agreements. (*See Robitaille v. AmBase Corp.,* 91 Civ. 3782 (PNL), Complaint at ¶ 53.)[12] In its turn AmBase asserted a series of counterclaims against Robitaille, two of which, in substance, parallel its counterclaims in this suit against Bowne and Chemical. In its answer, AmBase noted that it and several of its past and present directors were defendants in a derivative suit in New York State Supreme Court, in which the plaintiff shareholders alleged that AmBase officers and directors had breached their duty of care by failing to ensure the prompt mailing of the January 1991 proxy statement to shareholders, a failing that allegedly led to the delay in the sale of the Home and the loss of $12 million "in potential tax benefits." (Answer at ¶¶ 59–60.)[13] AmBase proceeded to allege that Robitaille had been responsible for mailing the proxy statement on or before January 17, 1991 and was responsible for the failure to mail it on a timely basis and hence for the two-week delay in the shareholder meeting and consummation of the Home transaction. (*Id.* at ¶¶ 62–65.)[14] Based on these allegations, AmBase pressed two counterclaims against Robitaille seeking indemnification or contribution for any liability im-

---

9. For example, items 2 and 3 on the first page of AmBase's privilege log are memoranda from Paul Dodyk, Esq., the Cravath partner who represented AmBase in related litigation, to the Board of Directors of AmBase, and are described as addressed to "[p]ending litigation involving AmBase." Absent a waiver of some sort, these communications and many like them on both the AmBase and the Cravath lists would be protected.

10. I see no need to withhold rulings as to the deposition questions in dispute since virtually all can be adjudicated without further motion practice.

11. The other two were Pam Shearer and Gail Meyer.

12. The complaint in *Robitaille* is annexed as Exhibit D to Bowne's and Chemical's letter motion to compel on the basis of waiver. The other two suits were *Meyer v. AmBase Corp.,* 91 Civ. 3782, and *Shearer v. AmBase Corp.,* 91 Civ. 6173. All three will be referred to jointly as the *Robitaille* litigation.

13. A copy of the Answer is annexed as Exhibit E to the waiver motion of Bowne and Chemical.

14. The reference to January 17, 1991 in paragraph 62 of the Answer may be a typographical error since it is inconsistent with other allegations, both in *Robitaille* and in this case, citing January 19, 1991 as the target date. (*See, e.g.,* Answer at ¶ 63.)

posed on the corporation by virtue of the missed mailing. (*Id.* at ¶¶ 65, 67.) [15]

As is apparent from these allegations, the *Robitaille* litigation necessarily raised questions concerning, *inter alia*, who was responsible for the late mailing, why the mailing was late, whether the delay in the mailing required a delay in the shareholders meeting, whether shareholder approval was necessary for the Home transaction, whether AmBase had to satisfy other pre-conditions for the sale to proceed, whether it was in a position to satisfy those conditions prior to the target date for the sale of the Home, and the extent of the tax benefits foregone by the delay. (*See, e.g.,* Defendant's Objections and Responses to Plaintiff's Second Set of Interrogatories 6, 7, 8.) These questions are of course also the principal issues raised by AmBase's counterclaims in this suit against Bowne and Chemical.

In the course of discovery in the *Robitaille* litigation, AmBase initially asserted both the attorney-client privilege and the work-product rule to block production of documents and deposition inquiries concerning communications or analyses involving the attorneys who had worked for AmBase in connection with the sale of the Home. Subsequently, however, AmBase, by its counsel, agreed to a limited waiver of all privilege and work-product claims in connection with the depositions of its witnesses. Thus, at the January 8, 1992 deposition of Bruce Bean, Esq., the general counsel of AmBase, Robitaille and the other two plaintiffs accepted an offer by AmBase to permit its witness to testify fully "with respect to privileged communications," provided that plaintiffs "not claim that the provision of such testimony entitles them to all other communications relating to that subject...." (Bean Dep. at 4.) [16] As explained by AmBase's attorney, the defendant agreed to allow plaintiffs to elicit "[a]ny testimony ... [a]s to any conversation or subject matter ... pertaining to this lawsuit," provided that it had occurred before the plaintiffs' departure from AmBase. In exchange the plaintiffs agreed not to argue to the court that such testimony waived the privilege of AmBase as to matters not inquired into. (*Id.* at 5–6, 8–9, 12.) The agreement encompassed only answers to deposition questions and not production of documents (*id.* at 6), but involved a waiver as to all matters relevant to the case within the specified time period ending June 1991. (*Id.* at 8.)

At the subsequent continued deposition of AmBase witness Helen Brooks, Esq., the parties agreed that the deposition "is now subject to the stipulation made at the deposition of Bruce Bean on January 8." (Brooks Dep. at 210.) [17] Subsequently, at the March 17, 1992 deposition of Cravath attorney David G. Ormsby, Esq., the parties again agreed to a waiver stipulation, which was summarized as follows by AmBase's counsel:

> MR. DODYK: I will note that the time is now 10:22, and I will also state for purposes of the record that counsel for defendant AmBase is prepared to allow Mr. Ormsby to answer any question put to him relating to the subject matter of this litigation where it would otherwise be privileged, if the plaintiff will stipulate that his answer to any question will not be used by them as the basis for an argument that the attorney-client or work product privileges have been waived with respect to anything other than the question answered on the basis of the answer to this question.

> MS. TAYLOR: We will so stipulate.

> MR. TISHMAN: So stipulated.

> MS. COHEN: I will also stipulate.

(Ormsby Dep. at 3.) [18] As is evident from counsel's wording, this stipulation did not

---

**15.** AmBase also asserted two counterclaims against Robitaille based on his alleged responsibility for certain claimed misrepresentations that were the subject of a securities fraud lawsuit then pending in this court. (*See* Answer at ¶¶ 68–73.)

**16.** Pertinent portions of the Bean deposition are annexed as a part of Exhibit A to the January 11, 1993 letter brief of Bowne and Chemical.

**17.** The pertinent portion of the Brooks deposition is annexed as part of Exhibit A to the waiver letter brief of Bowne and Chemical.

**18.** The pertinent portion of the Ormsby deposition is found at Exhibit A to the January 11, 1993 letter brief of Bowne and Chemical.

contain any explicit time limitation, although he may have meant to do so.

On the basis of these agreements, each of the three witnesses produced by AmBase testified fully in response to all questions posed by the three plaintiffs' attorneys concerning issues raised by the counterclaims of AmBase. These covered, *inter alia*, the circumstances surrounding the missed mailing, AmBase counsel's investigations of the incident and the attorneys' evaluation of the need for shareholder approval. Moreover, in the course of depositions of other AmBase employees, although the prior stipulations were not cited, defendant permitted those witnesses to testify as to the same subject matters without interposing privilege or work-product objections, even though at least some of the questions explored areas that presumably could have been subject to a claim of attorney-client privilege or work-product immunity.

Based upon both AmBase's express waiver of the attorney-client privilege and the work-product immunity in the *Robitaille* litigation and its disclosure in the *Robitaille* depositions of material protected by the privilege and work-product rule, Bowne and Chemical now argue that AmBase has surrendered any entitlement to the protection of the privilege and work-product rule in this case. Moreover, they urge that the scope of the waiver here be measured by the breadth of the express waiver in the other case—that is, a waiver as to all matters relevant to the subject matter asserted in *Robitaille*, which is co-extensive with the counterclaims asserted in this case.

In opposing this argument AmBase appears to rely principally on the decision in *Teachers Ins. and Annuity Ass'n of America v. Shamrock Broadcasting Co.*, 521 F.Supp. 638 (S.D.N.Y.1981), for the proposition that a disclosure of privileged matter to another party in one case, with the proviso that the waiver is limited, does not constitute a waiver for purposes of a later case. In support of its position AmBase proffers the affidavit of its trial counsel in the *Robitaille* litigation, who explains the tactical considerations that led AmBase to agree not to assert the privilege and work-product rule in the *Robitaille*

litigation, and further states that he did not intend the agreement with adversary counsel in those earlier lawsuits to constitute a waiver for any other purpose. (*See* Affidavit of Paul M. Dodyk, Esq., sworn to Feb. 4, 1993, at ¶¶ 3, 6.)

Alternatively, AmBase argues that if the disclosure in *Robitaille* effected a waiver in this case, the waiver should be limited as narrowly as possible. Thus, AmBase suggests, the waiver should be limited to the disclosure and use solely of the information contained in the answers permitted at the *Robitaille* depositions, or may possibly encompass as well follow-up inquiry addressed solely to the privileged communications specifically disclosed at the *Robitaille* depositions.

■■■ AmBase's assertion that it has not waived the privilege and work-product rule cannot be sustained. By its agreement to disclosure in the *Robitaille* lawsuit and its actual disclosure to the plaintiffs in that action, AmBase has lost the ability to preclude Bowne and Chemical from inquiry into those matters. Moreover, the scope of the waiver is properly defined more broadly than AmBase suggests.

I start by noting that since this case involves only claims and defenses arising under state law, Fed.R.Evid. 501 requires the application of state law—in this case New York law—to the attorney-client privilege waiver issue. Nonetheless, since the New York courts appear not to have directly addressed the waiver issue as framed here, I rely on case-law in other jurisdictions, including at least one decision by the Second Circuit. *See generally Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 47 (2d Cir.1993) (court may look to decisions in other jurisdictions) (citing cases).

■■■ The standards for waiver of the attorney-client privilege and of work-product immunity differ to a degree, with greater protection afforded to work-product. The attorney-client privilege is waived if the "holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Sup. Ct.St. 511. *See, e.g., Westinghouse Elec.*

*Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir.1991) (citing cases). *See generally* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence*, ¶ 511[02] at 511–4 to –8 (1990). Waiver does not require that the privilege holder "intentionally relinquish[ ] a known right." *Id.* at 511–6 to 7 & nn. 14–16 (citing *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672, 675 (D.C.Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979); *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 460–61 (N.D.Cal.1978)). *Accord, e.g., In re Sealed Case*, 676 F.2d 793, 823 (D.C.Cir.1982); *In re John Doe Corp.*, 675 F.2d 482, 488–89 (2d Cir.1982); *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C.Cir.1981); *Teachers Ins. & Annuity Ass'n of America v. Shamrock Broadcasting Co.*, 521 F.Supp. at 645; *Church of Scientology v. Cooper*, 90 F.R.D. 442, 443 (S.D.N.Y. 1981). If he voluntarily undertakes actions that will predictably lead to the disclosure of the document, then waiver will follow. *See, e.g., In re von Bulow*, 828 F.2d at 100–01. Moreover, waiver will be found even if the disclosure took place in a forum other than the lawsuit in which the waiver issue is raised, and even if the disclosure was made for a proper purpose to a person with an interest that is common to him and the privilege holder, unless that common interest is the receipt of legal services by an attorney. *See, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d at 1424–27 (disclosure to Department of Justice and SEC); *In re von Bulow*, 828 F.2d at 100–01 (publication of book by former attorney of party); *In re John Doe Corp.*, 675 F.2d at 488–89 (disclosure to public offering underwriter); *Permian Corp. v. United States*, 665 F.2d at 1221 (disclosure to SEC); *In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982*, 561 F.Supp. 1247, 1259 (E.D.N.Y.1982) (letter to Congressman).[19]

■ The protection of the work-product rule is less readily waived. *See, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d at 1428; *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 381–82 (5th Cir.

1989); *Permian Corp. v. United States*, 665 F.2d at 1219 (quoting *United States v. AT & T Co.*, 642 F.2d 1285, 1299 (D.C.Cir.1980)). As articulated by most courts, such a waiver will be found only if the party has voluntarily disclosed the work-product in such a manner that it is likely to be revealed to his adversary. Thus, disclosure simply to another person who has an interest in the information but who is not reasonably viewed as a conduit to a potential adversary will not be deemed a waiver of the protection of the rule. *See, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d at 1428; *United States v. Gulf Oil Co.*, 760 F.2d 292, 295–96 (Em.App.1985); *United States v. AT & T Co.*, 642 F.2d at 1299; *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 52 (S.D.N.Y.1979); *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 47 F.R.D. 334, 338 (S.D.N.Y.1969).

In this instance AmBase chose, for its own tactical reasons, to waive the privilege as to any matters relevant to the counterclaims in the *Robitaille* case. That disclosure was not in furtherance of the purpose of the privilege, which is to permit candid discussions between client and counsel so as to facilitate the attorney's rendition of legal advice. *See, e.g., Priest v. Hennessy*, 51 N.Y.2d at 67–68, 431 N.Y.S.2d at 513–14, 409 N.E.2d at 985–86. Although AmBase entered into this arrangement in another litigation and with another set of parties, that does not avert an implied waiver here.

As the District of Columbia Circuit noted in a related context:

> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.... The attorney-client privilege is not designed for such tactical employment.

*Permian Corp. v. United States*, 665 F.2d at 1221. *See also In re Subpoena Duces Te-*

---

19. The scope of the waiver may be affected by whether the disclosure is made in a judicial proceeding or in a non-judicial context. If the latter, the breadth of the waiver may be narrower. *See In re von Bulow*, 828 F.2d at 101–02. I address this issue below, at pp. 483–87.

*cum*, 738 F.2d 1367, 1370 (D.C.Cir.1984). This refusal to permit a party to engage in selective disclosure of privileged materials has been explicitly adopted by the Second Circuit, which held that disclosure by a corporation of confidential communications to its accountant and to an attorney for an underwriter waived the attorney-client privilege in a subsequent lawsuit. In so holding the Court noted:

> The District of Columbia recently considered a somewhat analogous case involving disclosure to one governmental agency in order to expedite proceedings under an agreement restricting disclosure to that agency while claiming the privilege as to subsequent demands by other agencies. *Permian Corp. v. United States*, 665 F.2d 1214 (D.C.Cir.1981). That Court rejected a "pick and choose" theory of attorney-client privilege. We agree with the sentiment and note that the case before us is somewhat stronger since it does not involve an agreement with a governmental agency purporting to protect the privilege so far as other agencies are concerned.

*In re John Doe Corp.*, 675 F.2d at 489. *Accord, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d at 1423–27; *see also In re Worlds of Wonder Sec. Litig.*, 147 F.R.D. 208, 211–13 (N.D.Cal.1992).

■ AmBase cannot avoid this result notwithstanding its attorney's stated intention not to waive the privilege except in the *Robitaille* litigation. As noted, the intent of the party and its attorney not to cause an implied waiver is immaterial if they intentionally undertake actions that have the effect of causing such a waiver. *See, e.g.*, 2 *Weinstein's Evidence* at 511–6 to 7 & nn. 14–16 (citing cases); *In re John Doe Corp.*, 675 F.2d at 488–89. *Accord, e.g., In re Sealed Case*, 676 F.2d at 823. Indeed, even if the disclosing party requires, as a condition of disclosure, that the recipient maintain the materials in confidence, this agreement does not prevent the disclosure from constituting a waiver of the privilege; it merely obligates the recipient to comply with the terms of any confidentiality agreement. *See, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d at 1426–30 (corporate dis-

closure to Department of Justice under agreement by Department to keep information confidential waived attorney-client privilege and work-product protection); *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 860 F.2d 844, 846–47 (8th Cir.1988) (disclosure of tape to adversaries during settlement discussions waived work-product protection despite non-disclosure agreement); *Permian Corp. v. United States*, 665 F.2d at 1217–22 (corporate disclosure of privileged documents to SEC under apparent assurances of confidentiality waived the attorney-client privilege). *See also Khandji v. Keystone Resorts Management, Inc.*, 140 F.R.D. 697, 699–700 (D.Colo.1992) (work-product protection would be waived even if disclosure was pursuant to a confidentiality agreement, but in such a case aggrieved party might assert contract claim).

■ As for the work-product immunity invoked by AmBase for some of the documents, as noted, the disclosure of work-product to another person with a shared interest in the material, even if not a litigation interest, does not waive the privilege unless the circumstances of the disclosure created a significant possibility that the material would ultimately be disclosed to an adversary. AmBase, however, disclosed the materials to its adversaries in *Robitaille*, and hence the disclosure necessarily waived the work-product immunity not only in that litigation but also in this lawsuit. *See, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d at 1428–30; *In re Chrysler Corp. Overnight Evaluation Program Litig.*, 860 F.2d at 846–47; *In re Subpoenas Duces Tecum*, 738 F.2d at 1372–75; *In re Worlds of Wonder Sec. Litig.*, 147 F.R.D. at 211–13.

In resisting these conclusions, AmBase relies principally upon the decision in *Teachers Ins. & Annuity Ass'n of America v. Shamrock Broadcasting Co.*, 521 F.Supp. 638 (S.D.N.Y.1981). In particular, AmBase cites Judge Conner's conclusion that if a corporation produces privileged documents in response to an SEC subpoena but does so "under a protective order, stipulation or other express reservation of the producing party's claim of privilege as to the material disclosed," no waiver will be found. *Id.* at

646. AmBase's reliance on this case is misplaced.

First, to the extent that the analysis in *Teachers Insurance* rests on the notion that in some circumstances the disclosure of privileged communications to a government agency for enforcement purposes may be so desirable a goal as to justify a rule of selective waiver, *see id.* at 641–44 (citing, *inter alia, Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 611 (8th Cir.1977)),[20] it has been effectively overruled. Thus, the D.C. Circuit in *Permian* explicitly rejected the waiver analysis in *Diversified Industries, see* 665 F.2d at 1220–22, and, as noted, the Second Circuit subsequently adopted the reasoning of *Permian. See In re John Doe Corp.,* 675 F.2d at 489. *Accord, Westinghouse Elec. Co. v. Republic of the Philippines,* 951 F.2d at 1423–27. These decisions post-dated the decision in *Teachers Insurance* and plainly undermined the central basis for its holding. *See, e.g., In re Worlds of Wonder Sec. Litig.,* 147 F.R.D. at 213.

Second, even if still valid, the reasoning of *Teachers Insurance* would not apply here. The initial disclosure by AmBase was not to a regulatory agency or otherwise intended to serve the law-enforcement purpose of such an agency. Rather, it was to private litigants, and was motivated solely by those litigants' desire for information that would further their litigating positions vis-a-vis AmBase and by the tactical calculation of AmBase's counsel that disclosure in those lawsuits would assist the posture of the corporation in anticipated future malpractice litigation. (*See* Dodyk Aff. at ¶ 3.)

Third, in any event AmBase has not shown that, at the time of the disclosures via deposition testimony, its attorneys imposed any requirement of confidentiality on Robitaille and his fellow plaintiffs or any "other express reservation of the producing party's claim of privilege as to the material disclosed." *Teachers Ins. & Annuity Ass'n of America v.*

*Shamrock Broadcasting Co.,* 521 F.Supp. at 626. In three of the *Robitaille* depositions, counsel for AmBase required an agreement solely that the disclosure of privileged information at that deposition would not be deemed by his adversaries to be a waiver as to any other materials, but he did not seek expressly to limit the waiver to that lawsuit. Moreover, in the remainder of the depositions, counsel did not make any reservations of privilege. In short, AmBase failed to adhere even to the strictures of the case on which it principally relies.

Having found a waiver, we must still determine the breadth of that waiver. As noted, the parties are in considerable disagreement on this point, with AmBase contending that the waiver should be limited to the specific testimony given in *Robitaille* or perhaps to that testimony and some undefined limited follow-up concerning only those privileged communications disclosed in the prior lawsuit. In contrast, Bowne and Chemical press for a breadth of waiver defined by counsel for AmBase when he represented in *Robitaille* that his client would not invoke the privilege and the work-product rule for any matters relevant to the claims and counterclaims in *Robitaille.*

Whether this debate has broad practical significance turns, of course, on the extent to which counsel for Robitaille and his co-plaintiffs in fact pursued all of the subjects relevant to the "missed mailing" counterclaims that AmBase volunteered to make available to them. The current record reflects exploration of some of these areas, although presumably not in the depth to which Bowne and Chemical wish to go. In any event, I conclude that neither side's position is fully supported by the caselaw.

The approach of Bowne and Chemical rests upon the notion that an express statement of intent to waive the privilege in one case is tantamount to a waiver for later cases

**20.** *Teachers Insurance* did not fully adopt the holding of *Diversified Industries* since Judge Conner imposed a requirement that the privilege holder explicitly assert that its production to the SEC was not intended to constitute a waiver as to anyone else. Nonetheless, it appears evident that the only rationale for allowing a selective waiver even in these circumstances is the stated policy goal of assisting regulatory agencies in their law-enforcement efforts. *See, e.g., Permian Corp. v. United States,* 665 F.2d at 1221–22 (citing *In re Grand Jury Subpoena Dated July 13, 1979,* 478 F.Supp. 368 (E.D.Wis.1979)).

even if the party making the statement never actually disclosed any privileged materials. In substance, this theory looks to the privilege holder's intent, and based upon the formation at one time of an intent to disclose—or, more precisely, a lack of intent to keep confidential—it deems the privilege waived. The logic of this approach would thus find a waiver in this case of the full subject matter of the counterclaims even if, in the *Robitaille* case, the plaintiffs' attorneys had not pursued any discovery of privileged matters after the announcement by AmBase's attorney that AmBase would not invoke the privilege or work-product rule to block questioning on relevant matters.

Under federal law, at least as interpreted in this circuit, this view appears to find support, at least by analogy. Most notably, in *In re Horowitz*, the Second Circuit considered, *inter alia*, the question of whether the privilege was waived for attorney-client documents when the client gave its accountant "unrestricted access" to the documents but the accountant in fact "never viewed" them. 482 F.2d at 81. Noting that the privilege "stands in derogation of the public's 'right to every man's evidence,'" 8 Wigmore, *supra*, § 2192, at 70, and as 'an obstacle to the investigation of the truth,' *id.* § 2291, at 554," *id.* at 81, Judge Friendly observed that

> it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence.

*Id.* at 81–82. Focussing on the privilege holder's intent to maintain the communications in confidence, the Second Circuit quoted an earlier district court decision:

> It is difficult to be persuaded that the documents were intended to remain confidential in the light of the fact that they were indiscriminately mingled with the other routine documents of the corporation and that no special efforts to preserve them in segregated files with special protections was made. One measure of their continuing confidentiality is the degree of

care exhibited in their keeping, and the risk of insufficient precautions must rest with the party claiming the privilege.

*Id.* at 82 (quoting *United States v. Kelsey-Hayes Wheel Co.*, 15 F.R.D. 461, 465 (E.D.Mich.1954)). The implication of this analysis, to which the Second Circuit adhered, is that the privilege cannot survive if the privilege holder lacks the continuing intention to maintain confidentiality, irrespective of whether the communications actually were disclosed. *Accord, e.g., Feinberg v. Hibernia Corp.*, 1993 WL 92516, at *2–3 (E.D.La.1993) (if party gives another access to all files, waiver in subsequent case covers all files even though original inspecting party looked at only some of the files).

The difficulty with this conclusion, however, is that New York rather than federal law controls the waiver of the attorney-client privilege in this case. Although the New York courts appear not to have addressed this precise issue, at least one New York Court of Appeals decision suggests that, if called upon to confront the waiver question, the court would look to the fact of voluntary disclosure and not merely the intent to disclose as key.[21]

In *In re Vanderbilt (Rosner–Hickey)*, 57 N.Y.2d 66, 453 N.Y.S.2d 662, 439 N.E.2d 378 (1982), the Court of Appeals dealt with the privileged status of two tapes made by a Dr. Rosen at some time prior to an unsuccessful suicide attempt. One tape was addressed to his wife, whereas the other was apparently intended for Dr. Rosen's medical colleagues. *See id.* at 82–83, 453 N.Y.S.2d at 672, 439 N.E.2d at 387. Following the suicide attempt, Dr. Rosen's wife obtained both tapes and ultimately arranged for their delivery, through various intermediaries, to an attorney who was to advise her husband, because he was then the subject of a grand jury investigation. The first tape was held to be protected by the spousal privilege, but the court's analysis of the status of the second tape is pertinent to the question before us.

---

21. Intent to disclose is a material element of a waiver claim under both federal and state law. *See, e.g., Manufacturers & Traders Trust Co. v. Servotronics, Inc.*, 132 A.D.2d 392, 398–401, 522

N.Y.S.2d 999, 1003–05 (4th Dep't 1987). Under New York law, however, it appears not to be sufficient.

Dr. Rosen claimed that the second tape was covered by a combination of the privilege against self-incrimination and the attorney-client privilege. Notwithstanding the apparent fact that when Dr. Rosen made the tape he did not intend for it to be confidential and despite the transmission of the tape to a variety of custodians prior to its delivery to the attorney, the Court held that the attorney-client privilege applied.

In so holding, the Court noted that Dr. Rosen had lost any protection for the fact that he had made the tape, since that fact was necessarily disclosed to the various custodians of the tape prior to its delivery to the attorney. Nonetheless, it concluded that since the contents of the tape had not been actually heard by anyone other than Dr. Rosen and the attorney, it was still in fact confidential "[n]otwithstanding [Dr. Rosen's] earlier intent to direct the tape's message to others." *Id.* at 77, 453 N.Y.S.2d at 669, 439 N.E.2d at 384. The underlying principle, according to the Court, was that "a client's mere intent to disclose to third persons the substance of the discussion held with the attorney does not mitigate the privilege. There must be actual disclosure, otherwise the confidence arising from the attorney-client relationship has not been breached." *Id.* at 77, 453 N.Y.S.2d at 668, 439 N.E.2d at 384.

Although the sequence of events in *Vanderbilt* is somewhat different from that found here—in *Vanderbilt* the tape was apparently initially intended for non-attorney disclosure and then the client formed the intent to disclose only to the attorney—the underlying principle appears equally applicable. It is the fact of voluntary disclosure, and not merely the intent to disclose, that triggers a finding of waiver. Moreover, this approach is found in other jurisdictions as well.

Most notably, in California the state's Evidence Code provides for waiver of the attorney-client privilege as to a communication "if any holder of the privilege, without coercion, has disclosed a significant part of the commu-

nication or has consented to such disclosure made by anyone." The provision goes on to state that "[c]onsent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating his consent to the disclosure, including his failure to claim the privilege in any proceeding in which he has the legal standing and opportunity to claim the privilege." Cal.Evid.Code § 912(a).

In interpreting this section, the California courts have explicitly held that intent to waive—even if manifested by the privilege holder in the form of subpoenas to former attorneys for production of the privileged documents for use in the case—does not waive the privilege if no such documents are in fact produced. "[T]he intent to disclose does not operate as a waiver[;] waiver comes into play after a disclosure has been made." *Lohman v. Superior Court,* 81 Cal.App.3d 90, 95, 146 Cal.Rptr. 171, 174 (1978).[22] *Accord, e.g., Brainerd & Bridges v. Weingeroff Enterprises, Inc.,* 1986 WL 10638, *2 (N.D.Ill. 1986) (quoting C. McCormick, *McCormick on Evidence* § 93 at 223 (3d ed. 1984)).

▆ Applying the apparent rule of New York, I conclude that the stated willingness of AmBase at the *Robitaille* depositions not to invoke the privilege did not in itself constitute a waiver for purposes of this case. Rather, the triggering event was the actual disclosure of privileged communications during the course of the depositions in that case.

From this conclusion we are necessarily led to the next question, which is the appropriate scope of the waiver of the privilege based on the testimony actually provided at the *Robitaille* depositions. In the absence of any substantial body of New York case law, I look to case law in other jurisdictions, scholarly commentary and other possible sources of relevant data. *See, e.g., Leon's Bakery, Inc. v. Grinnell Corp.,* 990 F.2d at 47 (citing *Calvin Klein Ltd. v. Trylon Trucking Corp.,* 892 F.2d 191, 195 (2d Cir.1989); *Francis v. INA Life Insur. Co.,* 809 F.2d 183, 185 (2d Cir.1987)).

---

**22.** The California waiver provision is virtually identical to Rule 510 of the 1974 Uniform Rules of Evidence (quoted at 2 *Weinstein's Evidence, supra,* ¶ 511[03] at 511–8), which has been described as "substantively the same" as Fed.St. Evid. 511. *See id.* Other states have adopted the same or comparable rules. *See id.* at 511–9 to 10 (summarizing state enactments).

Our first port of call is the Second Circuit, in which the key decision is *In re von Bulow*, 828 F.2d 94 (2d Cir.1987). The Court there held that public disclosure of privileged communications in an "extrajudicial" setting—in that case a published book—waived the privilege only with respect to the particular communications or portions of communications disclosed, and that a broader implied waiver could only be recognized if the party seeking disclosure could demonstrate some unfairness to it by virtue of this limitation. *Id.* at 101–03. The prototypical unfairness suggested by the Court would be a misleading pattern of disclosure, in which the privilege holder releases only communications or portions of communications favorable to his litigating position, while withholding any unfavorable ones. *Id.* at 102. Alternatively, if the privilege holder puts those communications in issue by virtue of his claims or defenses in the case, then a broader, so-called "subject matter" waiver should also be recognized. *Id.* at 102–03. *See also United States v. Bilzerian*, 926 F.2d 1285, 1291–94 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

AmBase reads *von Bulow* as applicable in this case to preclude any disclosure beyond what was previously revealed in *Robitaille*— that is, the substance of communications or portions of communications actually described by the witnesses there. Alternatively, it proposes to permit limited follow-up questioning, but apparently such inquiry would be permitted only as to the communications or fragments of communications actually described in the prior case.

This reading of *von Bulow*, which would treat pre-trial discovery as tantamount to the "extrajudicial" disclosure by publication addressed in that case, has been adopted by at least one court. *See Strategem Development Corp. v. Heron Int'l N.V.*, 1993 WL 6216, *3, 1993 U.S.Dist. LEXIS 89, *7–9 (S.D.N.Y.

Jan. 6, 1993). It is not, however, an inevitable conclusion since *von Bulow* was dealing only with a non-litigative disclosure and did not purport to define a complete jurisprudence of implied waiver. Moreover, although the Court in *von Bulow* limited the waiver in the published book context to the actual disclosures made in the book, the Court summarized the state of the law generally in somewhat different terms. Thus, in a reference of some pertinence here, it cited with apparent approval the decision of the Ninth Circuit in *Weil v. Investment/Indicators, Research & Mgt., Inc.*, 647 F.2d 18 (9th Cir.1981), in which the court held that disclosure of some privileged communications early in pre-trial discovery waived "the privilege only as to communications about the matters actually disclosed...." *In re von Bulow*, 828 F.2d at 103 (quoting *Weil v. Investment*, 647 F.2d at 25.) In short, under *Weil* the discovering party could obtain disclosure of other communications that concerned the same "matters" as were discussed in the disclosed communications. *See, e.g., McCormick–Morgan, Inc. v. Teledyne Indust., Inc.*, 134 F.R.D. 275, 279, *mod. on other gds.*, 765 F.Supp. 611 (N.D.Cal.1991). Not surprisingly, then, *In re von Bulow* has been cited as support for the proposition that prior deposition testimony on a "specific communication" constitutes a "waiver as to all other communications to the attorney on the same matter." *Thomas v. F.F. Financial, Inc.*, 128 F.R.D. 192, 193 (S.D.N.Y.1989).[23]

This notion that disclosure of privileged communications either in the course of litigation or in other contexts will open the door to exploration of all otherwise protected communications that deal with the same "matters" appears to be generally accepted in most other jurisdictions. Indeed, some embrace a broader concept of "subject matter" waiver based on prior disclosure, even if the

---

**23.** It also bears noting that *von Bulow* sought to distinguish *Teachers Insur. & Annuity Ass'n v. Shamrock Broadcasting Corp.*, 521 F.Supp. 638 (S.D.N.Y.1991), the very case relied on here by AmBase. The circuit court needed to address this question because Judge Conner had in fact held that a prior disclosure to the SEC had waived the privilege. Although that disclosure had been in aid of an agency investigation and

not in the course of a lawsuit, the Second Circuit treated it as tantamount to "disclosures made in a trial setting," which "have no application to disclosure in a book made outside a litigation context." 828 F.2d at 102. The implication is that the holding of *von Bulow* barring an implied waiver may be limited to a non-litigative setting. *But see id.* at 102 n. 1.

disclosure was to a government agency undertaking law enforcement responsibilities. Thus, for example, the Fourth Circuit has held that production of documents covered by the attorney-client privilege and work-product rule to the United States Attorney and the Department of Defense in order to settle possible criminal charges triggered a broad subject-matter waiver in later litigation. *See In re Martin Marietta Corp.,* 856 F.2d 619, 622–25 (4th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989). Although articulating its approach somewhat more narrowly, the D.C. Circuit has also held that prior disclosure of a privileged communication to a government agency waives the privilege for "all other communications relating to the same subject matter." *In re Sealed Case,* 676 F.2d at 809. *Accord, e.g., In re Sealed Case,* 877 F.2d 976, 980–81 (D.C.Cir.1989). It necessarily follows, under the reasoning of these cases, that disclosure in the context of litigation—whether by trial or deposition testimony or by production of documents—will result in an implied waiver broader than the original disclosure itself. *See, e.g., United States v. Bernard,* 877 F.2d 1463, 1465 (10th Cir.1989); *Lorenz v. Valley Forge Ins. Co.,* 815 F.2d 1095, 1099 (7th Cir.1987) (applying Indiana law); *Hollins v. Powell,* 773 F.2d 191, 196 (8th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); *Weil v. Investment/Indicators, Research & Mgt., Inc.,* 647 F.2d at 24; *Bower v. Weisman,* 669 F.Supp. 602, 604 (S.D.N.Y.1987), *mand. denied,* 835 F.2d 23 (2d Cir.1987); *State of Ohio v. McDermott,* 79 Ohio App.3d 772, 778, 607 N.E.2d 1164, 1167 (Ct.App.1992); *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 551 (D.C.1981); Note, "Disclosure Under the Securities Laws: Implications for the Attorney–Client Privilege," 90 Colum.L.Rev. 456, 461 & n. 25 (1990). *See also Agnew v. State,*

51 Md.App. 614, 650, 446 A.2d 425, 444–45 (1982) (waiver by publication in book).

It bears emphasis that these cases do not require the discovering party to demonstrate prejudice, such as, for example, proof that the privilege holder has disclosed only favorable materials.[24] They also do not require the discovering party to demonstrate that the privilege holder is putting the privileged communications in issue in the litigation. It appears sufficient, for a waiver as to subjects discussed in the disclosed conversations, that the privilege holder has voluntarily revealed only some of the communications on the subject and has withheld others. *See, e.g.,* "Developments in the Law–Privileged Communications: Implied Waiver," 98 Harv.L.Rev. 1450, *reprinted in* Westlaw pp. 2, 3 & n. 22, 28–29 (1985); VIII J. Wigmore, *Wigmore on Evidence* § 2337 at 636–38 (McNaughton rev. 1961).[25]

■■■ Given the ambiguous state of the law in this Circuit, and the general tenor of cases in other jurisdictions, I conclude that it is likely that the New York Court of Appeals would hold that a voluntary disclosure of privileged communications by deposition testimony in one case operates as an implied waiver as to all such communications concerning the particular matters addressed in the disclosed communications.[26] *Accord, e.g., Drimmer v. Appleton,* 628 F.Supp. 1249, 1252 (S.D.N.Y.1986) (applying New York law). Moreover, given the general tenor of the federal cases, it appears that a similar rule would apply to prior disclosure of work-product, at least if it does not disclose an attorney's thought process. *See, e.g., In re Martin Marietta Corp.,* 856 F.2d at 625–26 (distinguishing between "opinion" and "non opinion" work-product). Nonetheless, the term "matters" is not self-defining, and the breadth or narrowness of its definition may have a major impact on the scope of the

---

**24.** Bowne and Chemical make no such showing, nor is it likely that they could do so unless they had access to the withheld communications.

**25.** One possibly contrary comment is found in a footnote in *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d at 1426 n. 12 (citing *In re von Bulow*). The court indicated in dictum an assumption that prior disclosure of portions of a communication would require disclosure of

the balance of the communication, but not other communications absent a showing of prejudice.

**26.** This conclusion follows not only from the general weight of the case law, but also from the sense that, in the context of a case such as this, it would be unreasonable to expect Bowne and Chemical to make a specific showing of misleading disclosure by AmBase.

waiver. *See, e.g., In re Sealed Case,* 877 F.2d at 980–81; *McCormick–Morgan, Inc. v. Teledyne Industries, Inc.,* 134 F.R.D. at 279–84.

Rather than seek to formulate an abstract definition, I simply summarize those matters to which the waiver by AmBase will extend in this case. From a review of those portions of the *Robitaille* deposition transcripts proffered to the court by Bowne and Chemical, it appears that witnesses in the prior suit testified to privileged communications concerning, in whole or in part, the following matters [27]:

1. The decision by AmBase whether to seek the alleged $12 million in tax benefits possibly resulting from the Home transaction. (Bean Dep. 129.)

2. The general counsel's review of the proposed AmBase pleadings in the *Robitaille* suit. (Bean Dep. at 152.)

3. Discussions between the general counsel and an AmBase officer concerning Robitaille's entitlement to severance benefits. (Bean Dep. at 156–57.)

4. Discussions between the general counsel and AmBase officers and attorneys and outside counsel about the missed mailing and Robitaille's role in it and his general performance. (Bean Dep. at 159–60.)

5. The general counsel's legal analysis and that of AmBase's outside counsel as to whether the sale of the Home constituted a sale of substantially all of the assets of AmBase under Delaware law, thus triggering a requirement of shareholder approval. Also conversations between the general counsel and outside counsel on this issue, and the advice rendered by outside counsel. (Bean Dep. at 200–06.)

6. Discussions between the general counsel and outside counsel about the SEC 14(a) proxy issue. (Bean Dep. at 211–12.)

7. Discussions by the general counsel with officers of AmBase and outside counsel concerning the missed mailing, the reasons for it and its consequences. (Bean Dep. at 281–87.)

8. Discussions between the general counsel and outside counsel on whether to assert counterclaims in the *Bowne* litigation. (Bean Dep. at 290–91.)

9. Discussions by the general counsel with outside counsel as to events at the printer. (Bean Dep. at 295–96.)

10. Consultations between the general counsel and others regarding the wording of the proxy statement. (Bean Dep. at 514–18.)

11. Discussions of the general counsel with other attorneys, including outside counsel, and officers of AmBase as to whether the Home transaction constituted a change of control of AmBase. (Bean Dep. at 525–26.)

12. Discussions between the general counsel and outside counsel on whether the termination of Ms. Shearer was "for cause." (Bean Dep. at 573–74.)

13. The drafting of various provisions of the proxy statement. (Bean Dep. at 582–87.)

14. Communications by Robitaille to the general counsel concerning the missed mailing. (Bean Dep. at 595–96.)

\*　　\*　　\*　　\*　　\*　　\*

15. Discussions by in-house counsel with outside counsel about the legal requirement for shareholder approval of the sale of the Home. (Brooks Dep. at 210–14, 217–26.)

16. Legal reasons for the choice of date of the shareholder meeting. (Brooks Dep. at 232–33.)

17. Investigation by Helen Brooks, for the general counsel, concerning the reasons for the missed mailing. (Brooks Dep. at 288–301.)

\*　　\*　　\*　　\*　　\*　　\*

18. Conversation between the general counsel and staff counsel about the wording of the proxy statement and requirements of Delaware law on change of control. (Shearer Dep. at 268–76.)

19. Communications with outside counsel concerning whether the sale of the Home constituted a sale of substantially all of the assets of the company and therefore

---

**27.** As is evident from the list, some of the items overlap in terms of subject matter, but are listed separately because they appear in different depositions.

required shareholder approval. (Shearer Dep. at 330–36.)

\*   \*   \*   \*   \*   \*

20. Discussions by outside counsel with AmBase and its representatives concerning the requirement for shareholder approval of sale of the Home. (Ormsby Dep. at 11–24.)

21. Discussions by outside counsel with AmBase as to the wording of the proxy statement, the need for shareholder approval and the assumption-of-indebtedness issues. (Ormsby Dep. at 33–39, 53–55.)

22. Discussions by outside counsel with AmBase concerning the triggering of severance agreements. (Ormsby Dep. at 64–66.)

23. Discussions by outside counsel with AmBase up to the time of the deposition of David Ormsby, Esq., covering legal matters. (Ormsby Dep. at 67–68.)

24. Discussions between outside counsel and AmBase concerning whether the sale of the Home was a sale of substantially all of the business of AmBase. (Ormsby Dep. at 87–93.)

25. Discussions among outside counsel and with the AmBase general counsel as to the cause of the late mailing. (Ormsby Dep. at 209–14.)

\*   \*   \*   \*   \*   \*

26. Discussions between outside counsel as to whether the sale of the Home would require shareholder approval and affect the debt indentures. (Freeman Dep. at 12–15.)

27. Discussions between outside counsel and AmBase over the procedures for the mailing. (Freeman Dep. at 38–40.)

28. Discussions between outside counsel and AmBase about the timing of the mailing. (Freeman Dep. at 67–71.)

29. Discussions among counsel and AmBase as to the wording of the second proxy statement. (Freeman Dep. at 68–72.)

\*   \*   \*   \*   \*   \*

30. Conversations by Ambase officer with the general counsel of AmBase and outside counsel about their interpretation of the severance agreements. (Woodrum Dep. at 25–29.)

31. Discussions by AmBase officer with the general counsel about who was at fault for the late mailing. (Woodrum Dep. at 65–66.)

\*   \*   \*   \*   \*   \*

32. Advice from outside counsel to AmBase officer as to whether the sale of the Home constituted a change of control. (Plaxe Dep. at 20–21.)

■ By virtue of AmBase's waiver in the *Robitaille* litigation, Bowne and Chemical may explore the above-listed subjects by deposition questioning as well as by review of documents addressing them. As for the temporal scope of the waiver, although the stated waivers by AmBase at two of the depositions in the *Robitaille* litigation purported to be limited to the period until the *Robitaille* plaintiffs' termination from AmBase, there is no basis for imposing such a limitation on the implied waiver. *See, e.g., McCormick Morgan, Inc. v. Teledyne Indust.,* 765 F.Supp. 611, 613–14 (N.D.Cal.1991); *Smith v. Alyeska Pipeline Service Co.,* 538 F.Supp. 977, 980–82 (D.Del.1982), *aff'd,* 758 F.2d 668 (Fed. Cir.1984), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2142, 85 L.Ed.2d 499 (1985). Nonetheless, the waiver in *Robitaille* cannot fairly be read to encompass any communications between AmBase and its trial counsel in this case, or any work-product developed by or for trial counsel for this lawsuit.

### D. *Waiver by Assertion: The Status of Discovery Concerning the Missed Mailing*

As an alternative theory of waiver, Bowne and Chemical argue that AmBase has waived the protection of the attorney-client privilege and the work-product rule by virtue of its assertion of the counterclaims concerning the so-called missed mailing. The apparent thrust of this argument is that AmBase cannot withhold testimony reflecting the knowledge of various attorneys, both in-house and from the Cravath firm, concerning what caused the missed mailing because that testimony is vital to determining whether the fault for this misfortune rested, not with

Bowne or Chemical, but rather with AmBase or its attorneys or its accountants, all of whom were involved in the effort to complete the shareholder documents and have them printed and shipped. Alternatively, Bowne and Chemical assert that this information is, in any event, not privileged.

■■■ The "at issue" waiver principle appears to be accepted by both New York and the federal courts. *See, e.g., Jakobleff v. Cerrato, Sweeney & Cohn,* 97 A.D.2d 834, 835, 468 N.Y.S.2d 895, 897 (2d Dep't 1983) (citing cases); *In re von Bulow,* 828 F.2d at 102; *Synalloy Corp. v. Gray,* 142 F.R.D. 266, 269 (D.Del.1992). The prototypical example of a waiver by assertion is seen in cases in which a party's claim that he relied on the advice of counsel is tantamount to a waiver of any privilege barring disclosure of his attorney's communications with him on the subject matter. *See, e.g., Joy v. North,* 692 F.2d 880, 893–94 (2d Cir.1982); *People v. Edney,* 39 N.Y.2d 620, 625, 385 N.Y.S.2d 23, 26, 350 N.E.2d 400, 402 (1976); *Orco Bank v. Proteinas Del Pacifico,* 179 A.D.2d 390, 393, 577 N.Y.S.2d 841, 842 (1st Dep't 1992). Nonetheless, this waiver principle sweeps more broadly. As summarized by the New York courts, a waiver may be found "where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information." *Jakobleff v. Cerrato, Sweeney & Cohn,* 97 A.D.2d at 835, 468 N.Y.S.2d at 897 (citing *Connell v. Bernstein–MaCaulay, Inc.,* 407 F.Supp. 420, 422–23 (S.D.N.Y.1976); *Hearn v. Rhay,* 68 F.R.D. 574, 580 (D.Wash.1975)). *See also Jones v. Gelles,* 167 A.D.2d 636, 639, 562 N.Y.S.2d 992, 995 (3d Dep't 1990); *Leucadia Inc. v. Reliance Ins. Co.,* 101 F.R.D. 674, 679–80 (S.D.N.Y.1983).

The breadth of this rule is illustrated by the recent decision of the Second Circuit in *United States v. Bilzerian,* 926 F.2d 1285 (2d Cir.1991). The defendant in that case sought to invoke a "good-faith" defense to charges of securities fraud, and requested a ruling by the trial court that his decision to testify on his own behalf that he in fact believed his conduct not to be in violation of the securities laws would not waive the attorney-client privilege, provided that he did not claim to have relied on any advice by his attorney. The trial court declined to issue such a ruling and the Second Circuit affirmed. *Id.* at 1291–94. In so doing, the circuit court noted that "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." *Id.* at 1292 (citations omitted).

The implicit point was that even if a party does not attempt to make use of a privileged communication, he may waive the privilege if he asserts a factual claim the truth of which can only be assessed by examination of a privileged communication. Thus, in *Bilzerian* the Court concluded

This waiver principle is applicable here for Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required into issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

*Id.*

This ruling is consistent with decisions in other jurisdictions. Significantly, both *Bilzerian* and New York decisions rely upon the extensive analysis found in *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975). *See United States v. Bilzerian,* 926 F.2d at 1292; *Jakobleff v. Cerrato, Sweeney & Cohn,* 97 A.D.2d at 835, 468 N.Y.S.2d at 897. In *Hearn* the court summarized the principle as follows:

All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative

act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

68 F.R.D. at 581.

■ Application of these decisions to this case suggests at least an arguable basis for a waiver by AmBase of any asserted protection for communications by its attorneys concerning the intended timing of submission of materials to the printer and the events that led to the missed mailing. In effect, AmBase is claiming that it intended to have the mailing take place by January 19, 1991 and that it acted in accordance with that intent in dealing with the printer, the mailer and other participants in the process. AmBase equally is contending that the mailing delay is attributable to action or inaction by the printer and the mailer (Manufacturers Hanover). It appears from the depositions that a major role in these events was played by AmBase's attorneys, who dealt directly with the printer and with the accountants and other advisors, as well as with Manufacturers Hanover, and apparently also made decisions as to the timing of these events. It may fairly be argued that by asserting counterclaims that depend on assessing who was to blame for the delay, AmBase has put into issue the discussions that it had with its attorneys as to the arrangement, preparation and printing of the materials, as well as the actions of the attorneys, including their instructions to other participants concerning the timing and management of the events leading to the mailing, the process of revision of the materials undertaken shortly before the printing was to be started, any instructions to the accountants and others reviewing the materials, and conversations with the printer and Manufacturers Hanover. Although AmBase has apparently allowed disclosure in this suit of some of this information, it appears that some has been withheld on a claim of attorney-client privilege. Without access to this material, Bowne and Chemical may be unfairly deprived of potentially crucial evidence directly impacting on an evaluation of AmBase's proposed allocation of blame for the delay. Thus, even if these matters are otherwise subject to the privilege, the protection may be deemed waived.

■ In any event, most if not all of this material is not protectible since the role of the attorneys, in attending to the scheduling, timing and supervision of the last-minute revision process, and the printing, shipping and mailing of the materials does not come within the rubric of legal advice or legal services, and hence is not protected by the privilege. As has been noted in earlier cases, "the privilege governs the performance of duties by the attorney as legal counselor, and if he chooses to undertake additional duties on behalf of his client that cannot be so characterized, those activities and communications in furtherance of them are not privileged." *Rattner v. Netburn,* 1989 WL 223059, *5 (S.D.N.Y.1989) (citing cases). Although attorneys are often given a comparable role in superintending the process of preparation, printing and distribution of shareholder materials, this does not alter the fact that these functions are not, in substance, legal services. *See generally* 2 *Weinstein's Evidence, supra,* ¶ 503(a)(1)[01] at 503–22.

### E. Other Legal Issues Raised by the Parties

In the course of briefing the motions to compel by Bowne and Chemical, the parties have raised a number of discrete legal issues the resolution of which may narrow the scope of controversy concerning the propriety of deposition questions and especially the production of documents.

### 1. The New Attempt by AmBase to Assert Work–Product Protection

■ In its answering motion papers AmBase seeks to invoke the work-product rule for a variety of documents that were listed in its privilege log as subject only to the attorney-client privilege. This belated invocation of work-product protection runs afoul of the explicit requirements of S.D.N.Y. Civil Rule 46(e)(1), which provides that "[a]ny ground

not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived." AmBase did not seek an extension and has not explained its failure to invoke the work-product rule for those documents on a timely basis. Accordingly, that ground must be deemed waived.

## 2. The Application of the Attorney–Client Privilege and Work–Product Rule to Uncommunicated Attorney Thoughts

AmBase and its former counsel, Cravath, have apparently claimed both attorney-client privilege and work-product protection for some documents that do not constitute or reflect communications between the attorney and the client, and that concededly were not prepared in anticipation of litigation. I address these matters separately.

■ The attorney-client privilege covers communications between the attorney and the client, as well as between two attorneys who represent the client or between the client and the attorney's agent or between the client's agent and the attorney. *See, e.g., Golden Trade S.r.L. v. Lee Apparel Co.,* 1992 WL 367070, *3 (S.D.N.Y. Nov. 20, 1992); *Martin v. Valley Nat'l Bank,* 140 F.R.D. at 306. The privilege does not, however, protect an attorney's uncommunicated thoughts or memoranda to the file unless they contain otherwise privileged communications. *See, e.g., Matter of Bekins Storage Co.,* 118 Misc.2d 173, 179, 460 N.Y.S.2d 684, 691 (Sup. Ct.1983), *rev'd in part on other gds.,* 95 A.D.2d 655, 463 N.Y.S.2d 213 (1st Dep't 1983), *mod. and aff'd,* 62 N.Y.2d 324, 476 N.Y.S.2d 806, 465 N.E.2d 345 (1984). *Accord, e.g., Golden Trade S.r.L. v. Lee Apparel Co.,* 1992 WL at *6 (citing *Natta v. Zletz,* 418 F.2d at 637 n. 3).

■ As for AmBase's suggestion that the work-product rule protects an attorney's mental processes even if they were not exercised in contemplation of litigation, that is not correct. Rule 26(b)(3) imposes a specific requirement that the work-product rule be available only to protect matters created or articulated in contemplation of litigation. To hold otherwise would eviscerate that requirement, and the federal courts have not done

so. *See, e.g., Golden Trade S.r.L. v. Lee Apparel Co.,* 1992 WL at *7; *Bio–Rad Labs, Inc. v. Pharmacia Inc.,* 130 F.R.D. 116, 128 (N.D.Cal.1990). *See also Matter of Bekins Storage Co.,* 118 Misc.2d at 177, 460 N.Y.S.2d at 689–90.

## 3. The Status of Drafts of Otherwise Unprivileged Documents

■ The parties dispute whether a draft of a document prepared by an attorney may be protected by the attorney-client privilege. The rule in New York appears to be that a draft document prepared by an attorney is privileged if it contains information provided in confidence by the client and subsequently maintained in confidence. In the absence of such confidential information supplied by the client, the draft document is not privileged merely because the attorney prepared it. *See, e.g., Kenford v. County of Erie,* 55 A.D.2d 466, 469, 471, 390 N.Y.S.2d 715, 719 (4th Dep't 1977); *Matter of Bekins Storage Co.,* 118 Misc.2d at 179, 460 N.Y.S.2d at 691. *See also SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 522 (D.Conn.1976).

On the current record we have no evidence as to whether the documents withheld as "drafts" contain any client confidences. Having failed to offer such proof, AmBase cannot sustain its claim of privilege.

## 4. Communications Authored by or Shared With Employees of Subsidiaries or Other Third Parties

AmBase apparently disclosed a number of assertedly privileged communications to employees of its subsidiaries, in particular the Home Insurance Company. It nonetheless contends that these documents remain privileged, and it also claims privilege for documents prepared by such other entities. Ambase also shared allegedly confidential attorney-client communications with various of the financial advisors that were assisting it in completing the sale transaction involving the Home, but it claims, in substance, that these disclosures do not vitiate its assertions of privilege. Ambase fails, however, to sustain any of these arguments.

A number of courts have upheld the privilege for communications shared by the parent with its wholly-owned subsidiary, but they have done so only upon a showing that a common attorney was representing both corporate entities or that the two corporations shared a common legal interest and thus came within the joint-client rule, *see, e.g., Roberts v. Carrier Corp.*, 107 F.R.D. 678, 687–88 (N.D.Ind.1985); *United States v. American Tel. & Tel. Co.*, 86 F.R.D. 603, 616 (D.D.C.1979); *see also Medcom Holding Co. v. Baxter Travenol Labs.*, 689 F.Supp. 841, 844–45 (N.D.Ill.1988), or that the disclosure was made to an employee of the subsidiary for the principal or sole purpose of eliciting assistance to the attorney in rendering legal advice or other legal services. *See, e.g., Admiral Insur. Co. v. U.S. District Court*, 881 F.2d 1486, 1493 n. 6 (9th Cir.1989). *Cf. In re Horowitz*, 482 F.2d at 81 (disclosure of communication to accountant). These limitations are entirely consistent with the general standards applicable to the privilege in the corporate context, since disclosure of attorney confidences to corporate employees for purposes unrelated to the obtaining of legal services from the corporation's attorneys will vitiate the privilege. *See, e.g., F.T.C. v. TRW, Inc.*, 479 F.Supp. 160, 163 (D.D.C.1979); *Weinstein on Evidence, supra*, ¶ 503(b)[04] at 503–49 ("Information which 'is being circulated unnecessarily in the organization' should not be protected") (quoting Simon, "The Attorney–Client Privilege as Applied to Corporations," 65 Yale L.J. 953, 985 (1956)). As Judge Weinstein notes:

> The burden is on the corporation to provide information about its own internal security practices which would support a finding of confidentiality. If a corporation wants the benefit of the privilege it should enforce a fairly firm "need to know" of the communication rule.

2 *Weinstein on Evidence, supra*, at 503–49 to 50.

AmBase has failed to demonstrate that any of these circumstances apply here. While a subsidiary of AmBase, the Home maintained its own in-house counsel, who performed all legal services for the Home except for certain SEC filings, which were prepared by AmBase's counsel because financials were done on a consolidated basis. There is no suggestion, however, that the communication at issue on these motions involved these types of filings or that the disclosures to the Home were to assist in rendering that service.

The Home also was separately represented by outside counsel in connection with its sale by AmBase. This separate representation indicates an apparent recognition that the legal interests of the Home in this transaction were distinct from those of AmBase.

In seeking to defend its claims, AmBase argues, in substance, that it and the Home shared the same interest—that is, to consummate the sale. Even if we assume the accuracy of this conclusory assertion by counsel, the argument is flawed because the common interest is a business one, and not a joint legal interest. That being the case, it cannot be said that the two entities were joint clients for purposes of the privilege.

Finally, in any event, I note the complete absence of any evidentiary showing of the reasons for each of the disclosures to the Home. Absent such a showing, we are left with no basis to infer that they were for the purpose of assisting counsel—whether for AmBase or the Home—in rendering legal services.[28]

AmBase's position with regard to communications disclosed to its various financial advisors is similarly flawed. It claims that assertedly privileged communications did not lose their protected status by virtue of such disclosure, apparently because the disclosures served to assist the lawyers in the performance of legal services. Were this the case, AmBase would be correct. *See generally In re Horowitz*, 482 F.2d at 81; *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.1961); *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. at 518; *Golden Trade S.r.L. v. Lee Apparel Co.*, 1992 WL at *6 (citing *Weinstein's Evidence, supra*, ¶ 503(a)(3)[01] at 503–26 to 28). The difficulty with its position, however, is that it offers

---

**28.** These same failings preclude any protection for communications originating with the Home.

no evidence whatever to support the conclusory assertion of its attorneys in their letter brief. Thus the factual premise for the claim of continued privileged status is unproven.

### F. Steps to Be Taken to Resolve the Discovery Disputes

Having addressed the principal legal issues that have divided the parties on these motions, it remains for us to dispose of the specific requests made by Bowne and Chemical on their current motions. As noted, the virtually complete failure of proof by Am-Base could well justify granting full relief to the movants on their request for documents. Nonetheless, rather than set aside, at this stage, all protection afforded by the attorney-client privilege and work-product rule for more than 1,500 documents, when it is conceivable—from a review of the privilege logs—that such protection would be merited in some cases but for attorney error, the court will take alternative steps to bring this needlessly extended controversy to a close on an equitable basis.

With respect to the documents, AmBase is to apply the rulings incorporated in this decision to all of the withheld documents, and is to produce to Bowne and Chemical, within seven days, all documents that come within the categories referred to by the court as not protected. *See* pp. 486–92, *supra.* As for the balance of the documents, AmBase is to serve on Bowne and Chemical a set of affidavits and/or other evidentiary materials providing, on a document-by-document basis, whatever evidence it has to support its claims of attorney-client or work-product protection. This step is to be taken within eleven days.

Within three days thereafter, the parties' counsel are to meet and seek to resolve any disputes they may have with respect to the documents still withheld by AmBase and Cravath. If any such disputes cannot be resolved, AmBase is to promptly submit its evidentiary presentation and whatever documents remain in dispute to the court for its review. Bowne and Chemical may then serve and file responsive papers within five days thereafter.[29]

With regard to the deposition questions, there is no reason for further delay. The court will briefly summarize its rulings, which follow, in large measure, from application of the standards previously adverted to.[30] AmBase is to permit its witnesses to answer the following objected-to questions, together with reasonable follow-up inquiries:

| Witness | Transcript Page and Line |
|---|---|
| Adam Behar | Page 68, line 22 |
| | Page 88, lines 2, 9 |
| | Page 89, lines 9, 13, 19 |
| | Page 93, lines 12, 22 |
| | Page 94, line 8 |
| | Page 98, line 24 |
| | Page 100, line 9 |
| | Page 101, lines 15, 24 |
| | Page 102, line 23 |
| | Page 120, line 9 |
| | Page 203, line 10 |
| | Page 206, lines 17, 22 |
| Helen Brooks | Page 303, line 15 |
| | Page 324, line 25 |
| | Page 326, line 15 |
| | Page 328, line 13 |
| | Page 329, line 25 |

29. This tight schedule is imposed in deference to the stated concern of AmBase that pre-trial discovery be completed as quickly as possible.

30. Having noted that AmBase, in its responding papers, has withdrawn its objections to approximately one-third of the questions previously posed (*see* AmBase letter brief dated Feb. 5, 1993, at p. 25 n. 30), I address only the remaining questions.

Page   331, line 9
Page   399, line 22
Page   400, lines 3, 25
Page   401, lines 11, 14
Page   458, line 9
Page   460, line 8
Page   465, line 4
Page   466, line 20
Page   467, line 15
Page   518, line 9

John Ferrara       Page   179, line 21

Scott Freeman      Page   70, line 19
Page   71, line 4
Page   73, line 10
Page   89, line 14
Page   92, line 8
Page   125, line 25
Page   147, line 15
Page   154, line 23
Page   168, line 4
Page   205, lines 8, 17
Page   241, line 22
Page   242, line 19
Page   272, line 15
Page   292, line 24 [identified by Bowne and Chemical as Page 291, line 11]
Page   364, lines 10, 22
Page   397, line 8
Page   399, line 21
Page   504, line 18
Page   508, line 8
Page   636, lines 2, 21

Paul Robitaille    Page   41, line 12
Page   120, line 2
Page   150, line 22
Page   256, line 2
Page   272, line 4

---

The final issue to be addressed concerns the matter of expenses incurred on these motions. Under Fed.R.Civ.P. 37(a)(4), if the court grants a motion to compel, it is required to award the movant its reasonable fees and other expenses incurred on the motion unless the court determines that the losing party's "opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." If the motion to compel is granted in part, the court retains discretion to "apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner." (*Id.*).

From the analysis in this decision it is apparent that, in significant measure, the positions taken by AmBase on the current motions have not, in any meaningful sense, been justified. Virtually all of the objected-to depositions questions must be answered—indeed, AmBase conceded this point with respect to many of them after receipt of the movants' papers—and although the proportion of withheld documents ultimately to be produced is, as yet, uncertain, this is largely attributable to the plain inadequacy of the record made by AmBase, a failing that compels still another round of motion practice. Moreover, the positions taken by AmBase as to most of the legal issues posed by the

movants are simply not supported by the prevailing legal authority,[31] and in some cases are entirely bereft of any meaningful legal support.[32] Finally, I note that AmBase's factual assertion that the evidentiary record demonstrates the propriety of its privilege claims is, at least at this stage, simply false.

It necessarily follows that some award of expenses to the movants will be necessary. Because certain issues have been left open, there is no basis at this time to determine an appropriate apportionment. Rather, the court will address that question upon completion of the next, and final, round of motion practice.

## II. *The Motion of AmBase*

■ AmBase has moved in its turn to compel Bowne to turn over a series of factual memoranda prepared by Thomas Hodgson, then a Vice–President of Sales for Bowne. Those memoranda were withheld by Bowne on a claim of work-product.

A review of the affidavit by Mr. Hodgson as well as his deposition testimony reflects that he prepared these factual summaries only after AmBase had indicated to him that it would not pay its bills to Bowne in the wake of the missed mailing incident. (Affidavit of Thomas McEver Hodgson, sworn to Feb. 24, 1993, at ¶ 7.) Although litigation at that stage was not inevitable, the fair import of Mr. Hodgson's testimony was that he anticipated such a possibility and that he prepared his summaries principally for that eventuality. This suffices to meet the test under Rule 26(b)(3).[33]

AmBase appears to argue alternatively that it has a sufficient need for the documents to justify their production or that it is entitled to production under Fed.R.Evid. 612, because Mr. Hodgson relied upon those doc-

uments at his deposition. Neither argument is sustained on the current record. The purported need for the documents is premised on Mr. Hodgson's possibly imperfect memory of events. AmBase fails, however, to demonstrate that he was unable to recall important details at his deposition, and the mere fact that the memoranda were prepared nearer to the events in question than his deposition testimony cannot alone justify production or else the work-product rule would become a nullity for non-opinion materials.

As for Rule 612, AmBase must show not only that the witness reviewed the documents in preparation for his deposition, but that he relied upon them in testifying. *See, e.g., Spock v. Peil,* 759 F.2d 312, 317–18 (3d Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985); *Leucadia, Inc. v. Reliance Insurance Co.,* 101 F.R.D. at 678–79; *but see In re Joint Eastern & Southern District Asbestos Litigation,* 119 F.R.D. 4, 6 (E D. & S.D.N.Y.1988). No such showing having been made, AmBase cannot prevail on this point.

In sum, the motion to compel by AmBase must be denied since the documents are work-product, and AmBase has not demonstrated a basis for overcoming the immunity provided by Rule 26(b)(3).

## CONCLUSION

For the reasons stated, the motions of Bowne and Chemical to compel further disclosure are granted to the extent and on the conditions noted. The motion of AmBase to compel is denied.

**SO ORDERED.**

---

**31.** Indeed, AmBase initially failed to acknowledge the vast weight of authority holding that prior disclosure waived the privilege even when that disclosure was governed by a confidentiality agreement or a representation of limited waiver.

**32.** For example, as noted, counsel for AmBase at oral argument claimed that it was movants' burden in the first instances to demonstrate why the more than 1,500 documents withheld by AmBase and its former attorneys were not privileged.

Having indicated that it would supply legal authority to support this claim, it failed to do so.

**33.** I note that AmBase itself suggests that the missed mailing was a sufficient trigger for potential litigation to justify invocation of the work-product rule for subsequently prepared documents. (*See* AmBase letter brief dated February 5, 1993, at p. 30.)