Louise M. HARRIS, M.D., Plaintiff,

v.

PROVIDENT LIFE & ACCIDENT IN-SURANCE COMPANY, and Provident Companies, Inc., Defendants.

No. 99–CV–1093.

United States District Court,
N.D. New York.

Dec. 20, 2000.

Whiteman, Osterman & Hanna, Jean F. Gerbini, of counsel, Albany, NY, for plaintiff.

Bond, Schoeneck & King, LLP, Arthur J. Siegel, of counsel, Albany, NY, for defendants.

### MEMORANDUM–DECISION AND ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Louise M. Harris, M.D. ("Dr. Harris" or "plaintiff") commenced this diversity action on July 15, 1999, asserting causes of action for breach of the terms of her disability insurance policy and breach of covenant of good faith and fair dealing. The defendants Provident Life & Accident Insurance Company and Provident Companies, Inc. (collectively referred to herein as "Provident" or "defendants") moved to compel plaintiff to produce two medical reports which she claims are protected by the work product privilege. In a Memorandum–Decision and Order dated July 26, 2000, the Honorable David R. Homer, United States Magistrate Judge, denied the defendants'

motion. *See* Docket No. 26. The defendants now appeal the magistrate judge's order. Plaintiff opposes. This matter was submitted for decision without oral argument.

## II. *FACTS*

Dr. Harris is a board certified anesthesiologist who was employed at Glens Falls Hospital. She alleges that on March 16, 1998, she developed severe asthma while working at the hospital. On or about March 19, 1998, her treating allergist diagnosed her with an allergy to latex. She attempted to return to work on several occasions but her symptoms worsened and she stopped working in May of 1998.

Dr. Harris had purchased a disability insurance policy from Provident in July 1992. The policy provided for monthly payments of $10,560.00 in the event of her total disability from her occupation as an anesthesiologist. The policy also required the plaintiff to provide written proof of loss, and gave Provident the right to have Dr. Harris examined "as often as is reasonable while a claim is pending." (R. at 49.)

On May 11, 1998, Dr. Harris served a Notice of Claim on Provident, alleging that she had a latex allergy which prevented her from performing her duties as an anesthesiologist. In support of her claim, she submitted the names of three treating physicians, Dr. Michael Slaughter ("Dr. Slaughter"), Dr. Desmond DelGiacco, and Dr. George Jolly, and a statement from Dr. Slaughter describing her allergy. *Id.* at 62. She also signed authorizations permitting Provident to obtain medical records from "any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, ... institution or person that has any records or knowledge of me, my health, ... earnings or other insurance benefits." *Id.* at 59, 61.

On September 24, 1998 and September 28, 1998, Dr. Harris was seen by Dr. James DeMasi ("Dr. DeMasi"), an allergist retained by Provident to perform an Independent Medical Examination. Dr. DeMasi concluded that she was not allergic to latex and could return to work. On September 28, 1998, plaintiff wrote a letter to Provident,

claiming that Dr. DeMasi's examination was deficient and stated that

> There are several experts available in the new field of diagnosing latex allergy, and I feel it is time for me to see one of them. . . . Please let me know if any of these individuals are acceptable to you. My allergist is leaning toward Dr. Yuniger and the Mayo Clinic, and would be happy to make the arrangements if you wish.

*Id.* at 84.

Before receiving a response from Provident, Dr. Harris and Dr. Slaughter proceeded to make arrangements for her to be examined at Johns Hopkins Asthma & Allergy Center in Baltimore, Maryland ("Johns Hopkins") and at the Mayo Clinic in Rochester, Minnesota ("Mayo Clinic"). *See id.* at 124–25. She was examined at Johns Hopkins on October 15, 1998 and was scheduled to be examined at the Mayo Clinic on October 27, 1998.

On October 22, 1998, Dr. Harris received a telephone call from a Provident representative advising her that her claim was being denied and that "if she has the testing at the Mayo Clinic ... she can send that if it contradicts Dr. DeMasi's report." *Id.* at 129. Dr. Harris received a letter on October 24, 1998 confirming the denial of benefits. On October 27, 1998, she was examined at the Mayo Clinic. Dr. Slaughter's notes reveal that he received reports from both Johns Hopkins and the Mayo Clinic in January and July of 1999, respectively. *See id.* at 131–32.

On November 2, 1998, Dr. Harris wrote to Provident on November 2, 1998, objecting to its denial of coverage. In this letter, she stated "I expect you to reverse your decision on my claim in a timely fashion. . . . If I have not heard from you by November 10, 1998, I will be forced to begin legal action." *Id.* at 95. Provident advised her that it was upholding its decision to deny benefits.

Sometime in 1998, plaintiff consulted with Alan Laufman ("Laufman"), an attorney in Texas, concerning the possibility of commencing a civil action against latex glove manufacturers. In his two paragraph affidavit, Laufman states that "[i]n anticipation of said litigation, Dr. Harris consulted allergy

specialists at Johns Hopkins University and at the Mayo Clinic at my direction." *Id.* at 138.

On July 15, 1999, plaintiff commenced this action, seeking payment of disability benefits. During discovery, Provident requested and received authorization to obtain the records of plaintiff's three treating physicians. Plaintiff's physicians produced certain records, but not the reports from Johns Hopkins or the Mayo Clinic. Provident also served interrogatories requiring plaintiff to produce a privilege log and to "[i]dentify all physicians or other medical professionals plaintiff has seen for the purposes of treatment, diagnosis, evaluation, testing, examination or for any other reason from January 1, 1985 to the present." *Id.* at 151. In response, plaintiff provided the names of her three treating physicians. No privilege log was provided.

At plaintiff's deposition on March 15, 2000, she was asked about the evaluations performed at the Mayo Clinic and at Johns Hopkins, since they were referenced in Dr. Slaughter's notes. She testified that a Texas attorney requested that she be evaluated. Plaintiff's attorney objected to further inquiry, asserting the work product privilege.

The defendants then brought a motion to compel production of the reports from Johns Hopkins and the Mayo Clinic. The defendants appeal from the magistrate judge's Memorandum–Decision and Order which concluded that the reports were privileged based on Laufman's affidavit, and that Dr. Harris had not waived the privilege by providing the reports to her treating physicians. Docket No. 26 at 1–8. Finally, the magistrate judge determined that the defendants had not shown substantial need for the reports and undue hardship, pursuant to Fed. R.Civ.P. 26(b)(3). *Id.* at 9.

## III. *DISCUSSION*

### A. *Standard of Review*

The standard for review of a magistrate judge's decision on non-dispositive matters is whether the magistrate judge's findings are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a). Clear error may be found "when although

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Stetz v. Reeher Enters., Inc.,* 70 F.Supp.2d 119, 120–21 (N.D.N.Y.1999)(quoting *Vandewalker v. Quandt's Food Serv. Distribs., Inc.,* 934 F.Supp. 42, 48 (N.D.N.Y.1996)); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

### B. *Work Product Privilege*

■ The work product doctrine, codified in Fed.R.Civ.P. 26(b)(3), provides that

[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusion, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998)(quoting *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

■ A party seeking work protect protection has the initial burden of showing that the material 1) is a document or tangible thing, 2) was prepared in anticipation of litigation, and 3) was prepared by or for a party, or by or for his representative. *See Mount Vernon Fire Ins. Co. v. Try 3 Bldg. Servs., Inc.,* No. 96 CIV. 5590 MJL HBP,

1998 WL 729735, at *4 (S.D.N.Y. Oct. 16, 1998). Once established, the burden then shifts to the party seeking discovery to show "substantial need for the material and an inability to obtain its substantial equivalent from another source without undue hardship." *Id.*

The parties do not dispute that the reports from Johns Hopkins and the Mayo Clinic satisfy the first and third elements of the aforementioned test. Thus, the issue is whether the plaintiff has met her burden of demonstrating that the material she seeks to withhold from discovery was prepared in anticipation of litigation.

■■■ "A document need not be prepared primarily or exclusively to assist at trial in order to be prepared 'in anticipation of litigation.'" *Mount Vernon Fire Ins. Co. v. Try 3 Building Services, Inc.*, 1998 WL 729735, at *5 (quoting *Adlman*, 134 F.3d at 1203). The proper test is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Adlman*, 134 F.3d at 1202 (quoting 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2024 (1994)). However, more than a "remote possibility of litigation" must be shown. *Occidental Chemical Corp. v. OHM Remediation Servs. Corp.*, 175 F.R.D. 431, 434 (W.D.N.Y.1997)(quoting *Garfinkle v. Arcata Nat. Corp.*, 64 F.R.D. 688, 690 (S.D.N.Y. 1974)). Rather, "[l]itigation must at least be a real possibility at the time of preparation or, in other words, the document must be prepared with an eye to some specific litigation." *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 143 (D.Del.1982).

■■■ In the present case, the magistrate judge determined that "Laufman's spare but uncontradicted affidavit establishes a litigation purpose for obtaining the medical evaluations." Docket No. 26 at 7. However, for several reasons, discussed below, the magistrate judge's finding is clearly erroneous and must be reversed.

Although Laufman's affidavit is not directly contradicted, there is significant circumstantial evidence in the record which creates considerable doubt that the evaluations performed at Johns Hopkins and the Mayo Clinic were obtained for purposes of litigation. To begin with, Laufman's two paragraph affidavit states in its entirety:

ALAN LAUFMAN, M.D., J.D., being duly sworn, deposes and says:

1. I am an attorney at law duly admitted to practice in the Courts of the State of Texas. I was retained by PlaintiffLouise (sic) Harris, M.D. in 1998 to provide legal advice to her in connection with her potential prosecution of a civil action against certain latex glove manufacturers for damages for injury suffered by Dr. Harris as a result of her exposure to latex allergens.

2. In anticipation of said litigation, Dr. Harris consulted allergy specialists at Johns Hopkins University and at the Mayo Clinic at my direction.

(R. at 138.) This "spare but uncontradicted affidavit" fails to set forth any specifics concerning the months in which Laufman was retained or in which he recommended that Dr. Harris consult specialists to evaluate her alleged allergy. It also fails to provide any indication of the instructions which may have been given to the doctors at Johns Hopkins and the Mayo Clinic concerning the purpose for their evaluations.

Dr. Harris has not submitted her own affidavit to flesh out the details concerning her consultation and retention of Laufman or his recommendation to consult specialists at Johns Hopkins and the Mayo Clinic. Her letters to Provident also give no indication that she consulted with an attorney or that she was pursuing any other possible litigation with respect to her latex allergy. Moreover, in her September 28, 1998 letter, she stated that *she* felt it was time for her to see an expert "in the new field of diagnosing latex allergy" and that *her allergist* "is leaning toward Dr. Yuniger and the Mayo Clinic, and would be happy to make the arrangements if you so desire." *Id.* at 84. This letter makes it appear that it was Dr. Harris' and her allergist's decision to see specialists.

The record also shows that Dr. Harris and Dr. Slaughter arranged for her appointments at Johns Hopkins and the Mayo Clinic. *Id.*

at 124–25. In addition, a Provident representative noted that when she told Dr. Harris that she could submit the results of testing done at the Mayo Clinic if the findings contradicted Dr. DeMasi, Dr. Harris stated that "she shouldn't have to spend the money." *Id.* at 129. This response raises the question of why Dr. Harris should require Provident to pay for her evaluation at the Mayo Clinic if Laufman referred her there in anticipation of an entirely separate and unrelated litigation.

It is also curious that the plaintiff did not request that the magistrate judge conduct an *in camera* review of the reports in question. As a result, instructions given to the specialists at Johns Hopkins and the Mayo Clinic, if any, are unknown. Review of the reports may have shed definitive light on who referred Dr. Harris to those specialists and the purpose of such referral. Such information is critical to determining whether the referrals, and the reports generated therefrom, were done "in anticipation of litigation." In addition, since the contents of the reports are solely within the knowledge of the plaintiff, her failure to make a request for an *in camera* inspection raises at least an inference that the reports would not have supported her position.

In light of all of the above, Laufman's vague two-paragraph affidavit is insufficient to satisfy plaintiff's burden of establishing that the reports generated from her consultations with specialists at Johns Hopkins and the Mayo Clinic were made in anticipation of litigation.

### B. *Substantial Need and Undue Hardship*

■ Even assuming that the plaintiff had sustained her burden of demonstrating that the reports were protected by the work product privilege, the defendants have shown substantial need for the reports and undue hardship if discovery were not ordered. The record clearly demonstrates that the reports in question are critical to the defense because they do not confirm that plaintiff has a latex allergy. *See id.* at 125, 131–32. The record also shows that Dr. Harris' treating doctors reviewed, considered, and relied upon the

evaluations in assessing her condition and prescribing treatment. *See id.* at 131–32, 134–35. As such, the defendants should be provided the evaluations in order to be able to fully and effectively cross-examine plaintiff's physicians, who can be expected to provide expert testimony at trial.

### C. *Waiver*

The magistrate judge also determined that Dr. Harris did not waive work product protection by disclosing the medical reports to her treating physicians. Docket No. 26 at 8. Although the issue of waiver need not be addressed in light of the determination that the material in question are not protected by the work product privilege, as an alternative argument, even if the material were so protected, the magistrate judge erred in finding that the plaintiff did not waive the privilege.

■ The work product privilege may be waived "only if the party has voluntarily disclosed the work-product in such a manner that it is likely to be revealed to his adversary. Thus, disclosure simply to another person who has an interest in the information but who is not reasonably viewed as a conduit to a potential adversary will not be deemed a waiver of the protection of the rule." *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 479 (S.D.N.Y. 1993). "[T]he disclosure of work-product to another person with a shared interest in the material, even if not a litigation interest, does not waive the privilege unless the circumstances of the disclosure created a significant possibility that the material would ultimately be disclosed to an adversary." *Id.* at 480.

■ The magistrate judge concluded that the disclosure to Dr. Harris' treating physicians occurred prior to Provident's denial of benefits on October 24, 1998 and that "[t]here is no evidence that Harris knew or should have known she would be pursuing litigation against Provident at the time of such disclosure. Therefore, Harris could not have reasonably believed or intended that such disclosure to her treating physician would result in disclosure to her adversary." Docket No. 26 at 8.

Dr. Harris signed broad medical releases on May 11 and September 29, 1998 authorizing Provident to obtain medical records from any medical personnel or facility having any records or knowledge of the plaintiff's health. (R. at 59, 61, 86.) Her evaluation at Johns Hopkins took place on October 15, 1998. She was advised by telephone and by letter that her claim was being denied on October 22 and October 24, 1998, respectively. After being so advised, she was evaluated at the Mayo Clinic on October 27, 1998. Thereafter, on November 2, 1998, she threatened legal action against Provident. Her treating physician did not receive the written reports from Johns Hopkins or the Mayo Clinic until January and July of 1999, respectively.

Four things are clear. First, both of plaintiff's evaluations occurred after she had submitted three releases to Provident. Second, plaintiff's appointment at the Mayo Clinic occurred after she was informed that her claim for benefits was denied. Third, the written reports from Johns Hopkins and the Mayo Clinic were released and received by Dr. Slaughter well after she was denied benefits and had threatened legal action. Fourth, at no time did plaintiff revoke or limit the releases despite ample time to do so before the reports were released to her treating physician. Thus, under the circumstances, the plaintiff must have known that any evaluations done and reports released would be available to Provident. Consequently, even assuming that these reports were protected by the work product privilege, the plaintiff waived that privilege through the releases to Provident.

### D. *Work Product Obtained for Unrelated Litigation*

Incidentally, it should also be noted that the reports in question should not be shielded from discovery for the additional reason that they were not obtained for use in this case, but rather, in an unrelated possible lawsuit against unknown and unrelated defendants. *See In re Savitt/Adler Litigation*, 176 F.R.D. 44, 47 (N.D.N.Y.1997)(Pooler, J.)(holding that work product protection did not extend to information obtained by a plaintiff while serving as an attorney in an-

other case because the information was not obtained for use in the case in which she was the plaintiff); *see also Hendrick v. Avis Rent A Car Sys., Inc.*, 916 F.Supp. 256 (W.D.N.Y. 1996).

### IV. *CONCLUSION*

The magistrate judge committed clear error in finding that the medical reports from Johns Hopkins and the Mayo Clinic are protected by the work product doctrine. The vague and unsupported affidavit from Laufman is inadequate to demonstrate a litigation purpose for the documents. There is substantial circumstantial evidence that these reports were not prepared in anticipation of litigation, but rather, that the plaintiff and her treating physician sought the evaluations for purposes of diagnosis and treatment. Alternatively, due to the critical nature of these reports to the defense and the fact that the plaintiff's treating physicians relied upon these reports, the defendants have shown substantial need and undue hardship sufficient to warrant disclosure. Further, even assuming that these reports are privileged, the magistrate judge erred in concluding that the plaintiff did not waive the privilege. Finally, the reports should not be protected from discovery in this case because they were obtained for use in an unrelated litigation.

Accordingly, it is

ORDERED, that

1. The Memorandum–Decision and Order, dated July 26, 2000 is REVERSED; and

2. Copies of the medical evaluations generated at Johns Hopkins Asthma & Allergy Center and the Mayo Clinic shall be released to the defendants Provident Life & Accident Insurance Company and Provident Companies, Inc. on or before Friday, December 29, 2000; and

3. The defendants shall be permitted to depose the plaintiff concerning those evaluations.

IT IS SO ORDERED.